IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS INDIANA

PLANNED PARENTHOOD OF INDIANA,      )
INC., *et al.*,                      )
                                     )
        Plaintiffs,                  )
                                     )
        v.                           )       No.
                                     )
COMMISSIONER OF THE INDIANA STATE    )
DEPARTMENT OF HEALTH, *et al.*,      )
                                     )
        Defendants.                  )    **1:11-cv-0630 TWP -TAB**

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Recently enacted House Enrolled Act 1210 (effective in part on May 10, 2011, and in part on July 1, 2011), has the effect of prohibiting certain entities that perform abortions from receiving any state funding, including funding for services unrelated to abortions. The statute also cancels existing contracts that the State of Indiana has with the entities. Although not mentioned by name in the new statute, the largest—if not the only entity—that is affected and penalized by the law is Planned Parenthood of Indiana (PPIN). Through Medicaid, the federal Preventive Health Services Block Grant, and Titles V and XX of the federal Social Security Act, PPIN is the recipient of funding to provide basic health services, education, family planning, and social services to thousands of Hoosiers. None of these services has anything to do with abortions. These contracts have now all been cancelled. The cancellation of existing contractual obligations is unlawful under the Contract Clause, U.S. CONST. art I, § 10, cl. 1. Moreover, Medicaid recipients have an explicit federal statutory right to receive services from any

Medicaid-eligible provider, and PPIN remains such a provider.  Therefore, the law violates

Section 1396a(a)(23) of the Medicaid Act.  The State of Indiana's attempt to add new conditions,

not present in federal law, to its pass-through of federal funds to PPIN is preempted by federal

law and is unlawful.  Finally, penalizing PPIN because it provides abortion services represents an

invalid and unconstitutional condition imposed by the State.

House Enrolled Act 1210 also modifies the informed consent information that PPIN and

its practitioners who practice or assist with abortions must give to their patients receiving

abortion services.  Women must now be told both that "objective scientific information shows

that a fetus can feel pain at or before twenty (20) weeks of postfertilization age" and that "human

physical life begins when a human ovum is fertilized by a human sperm."  Given that PPIN does

not perform abortions past the first trimester of pregnancy—indeed, at least 92% of all Indiana

abortions occur in the first trimester—and that there is absolutely no evidence that fetal pain can

occur during this period, the information compelled by the former statutory provision is

misleading and irrelevant and violates the protections given to PPIN and its employees to be free

from compelled speech.  The latter compelled information, concerning when human physical life

begins, does not concern a fact at all, but represents an opinion or belief that the State is

demanding that PPIN and its employees mouth.  This also violates the constitutional protection

against compelled speech.

### THE PRELIMINARY INJUNCTION STANDARD

The standard in the Seventh Circuit for the granting of a preliminary injunction is clear.

In order to determine whether a preliminary injunction should be granted, the Court weighs

several factors:

> (1) whether the plaintiff has established a prima facie case, thus demonstrating at
> least a reasonable likelihood of success at trial;

(2) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;

(3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and

(4) whether, by the grant of the preliminary injunction, the public interest would be disserved.

*See, e.g.*, *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987). The heart

of this test, however, is "a comparison of the likelihood, and the gravity of two types of error:

erroneously granting a preliminary injunction, and erroneously denying it." *Gen. Leaseways,*

*Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984).

## THE NEW STATUTORY PROVISIONS

The new statutory provisions imposed by House Enrolled Act 1210 ("HEA 1210") that

are challenged in this action are as follows:

1.    Indiana Code § 5-22-17-5.5(b)–(d) (effective May 10, 2011), provides that:

> (b) An agency of the state may not:
>     (1) enter into a contract with; or
>     (2) make a grant to;
> any entity that performs abortions or maintains or operates a facility where abortions are performed that involves the expenditure of state funds or federal funds administered by the state.
>
> (c) Any appropriations by the state:
>     (1) in a budget bill;
>     (2) under IC 5-19-1-3.5; or
>     (3) in any other law of the state;
> to pay for a contract with or grant made to any entity that performs abortions or maintains or operates a facility where abortions are performed is canceled, and the money appropriated is not available for payment of any contract with or grant made to the entity that performs abortions or maintains or operates a facility where abortions are performed.
>
> (d) For any contract with or grant made to an entity that performs abortions or maintains or operates a facility where abortions are performed covered under

> subsection (b), the budget agency shall make a determination that funds are not available, and the contract or grant shall be terminated under section 5 of this chapter.

The statute does not does not apply to "hospitals licensed under IC 16-21-2 or ambulatory surgical centers licensed under IC 16-21-2." IND. CODE § 5-22-17-5.5(a) (effective May 10, 2011).

2.   Indiana Code § 16-34-2-1.1(a)(1) (effective July 1, 2011) requires that a woman seeking an abortion be provided, both orally and in writing, with the following information:

> (E) That human physical life begins when a human ovum is fertilized by a human sperm.
>
> * * *
>
> (G) That objective scientific information shows that a fetus can feel pain at or before twenty (20) weeks of postfertilization age.

### STATEMENT OF FACTS TO BE ADDUCED

I.   STATEMENT OF FACTS RELATED TO COUNT ONE (DEFUNDING PROVISIONS)

A.   *Services Provided by Planned Parenthood of Indiana*

PPIN is an Indiana not-for-profit corporation that provides comprehensive reproductive health care through twenty-eight (28) health centers located throughout Indiana, as well as one (1) administrative office located in Indianapolis. PPIN does not operate any hospitals or ambulatory surgical centers licensed under Indiana Code 16-21-2-1, *et seq.* In the past year, PPIN has provided services to 76,229 family-planning patients in Indiana (a figure that does not include patients who have received solely abortions or abortion-related services). These services include cervical (or Pap) smears, cancer screening, sexually transmitted infection testing, self-examination instructions, and a variety of birth control options. A very small percentage of PPIN's services involve abortion and abortion-related services to women.

In order to pay for its non-abortion services, PPIN accepts several forms of insurance, receives monies that originate from the federal government, and is also a Medicaid provider.

### B. Planned Parenthood of Indiana's Enrollment in the Medicaid Program

In order to be enrolled as a Medicaid provider in Indiana, PPIN has executed a Provider Agreement with the Indiana Family and Social Services Administration ("FSSA"), the state agency responsible for administering the Medicaid program.  This agreement is an open-ended contract that is subject to termination or other sanctions in the event that PPIN engages in fraudulent or illegal activity, or otherwise violates the terms of the agreement.  *See* IND. ADMIN. CODE tit. 405, r. 1-1-6.  Pursuant to the agreement, PPIN is to be reimbursed with a combination of federal and state monies, paid through FSSA, for the Medicaid reimbursed services provided to its patients.  The Medicaid-reimbursed services provided by PPIN are subsumed under the category of "family planning services," which includes (among other things) the diagnosis and treatment of sexually transmitted diseases, health education and counseling necessary to make informed choices and understand contraceptive methods, pregnancy testing and counseling, the provision of contraceptive pills and supplies, the screening and testing of individuals at risk for HIV, and Pap smears.  *See* INDIANA HEALTH COVERAGE PROGRAMS, PROVIDER MANUAL, at 8-258–60, *available at* http://provider.indianamedicaid.com/ihcp/manuals/chapter08.pdf  (last visited May 5, 2011).  Although PPIN also provides and performs abortions, these services are generally not reimbursed through the Medicaid program or through any other state or federal funding.  However, abortions that are performed when the pregnancy occurred as a result of rape or incest, and where the pregnant woman presents a police report to that effect, are reimbursable by and reimbursed through the Medicaid program.

In the past year, PPIN provided services to more than nine thousand three hundred

(9,300) Medicaid patients throughout Indiana.[1]  Indeed, approximately 70% of all of PPIN's patients in the past year have had incomes at or below 150% of the federal poverty level. Among other Medicaid-enrolled patients receiving these services from PPIN are Letitia Clemons and Dejiona Jackson, who both receive annual examinations and other services at their local PPIN health care centers and for whom the Medicaid program pays for these services.  Both individuals have selected PPIN to be their provider of choice and wish to continue utilizing PPIN's services and to continue having those services provided through the Medicaid program. PPIN remains qualified to perform these services. Ms. Clemons' next visit to PPIN for these purposes is scheduled for June 9, 2011; Ms. Jackson's next visit is due any day now.[2]

C.  *Planned Parenthood's Receipt of Other Federally Funded Grants*

Additionally, PPIN is reimbursed for other services from funds originating through a series of federal grants and programs that pass through the State in various ways.  At the current time, PPIN has two (2) contracts with the Indiana State Department of Health ("ISDH"), which do not expire until December 31, 2011, for $150,000 for Diseases Intervention Services ("DIS"). These grants assist in ensuring that individuals in the DIS-assigned region who are diagnosed with or exposed to sexually transmitted diseases are located and promptly tested or treated as appropriate.   The funds for the DIS grants are made through the federal Preventive Health Services Block Grant Program, 42 U.S.C. § 247c, *et seq.*, and utilize entirely federal monies.

Additionally, PPIN receives a grant through Title V of the Social Security Act ("Title V"), 42 U.S.C. § 701, *et seq.* to provide maternal and child health care services to its patients,

---

[1] In Indiana, Medicaid recipients are enrolled in either "traditional" Medicaid or Medicaid programs allowed by the federal government in a "demonstration project"  which are known as "Hoosier Healthwise" and the "Healthy Indiana Plan."  PPIN has patients enrolled in all three (3) programs.

[2] Ms. Clemons obtains her Medicaid assistance through enrollment in a managed care organization; Ms. Jackson is enrolled in traditional Medicaid, and is not enrolled in Hoosier Healthwise or the Healthy Indiana Plan, and does not obtain Medicaid services through a managed care organization.

and a grant through Title XX of the Social Security Act ("Title XX"), 42 U.S.C. § 1397, *et seq.*, to provide a variety of social services to its patients. Through both Title V and Title XX, the federal government provides a block grant to Indiana, which has sub-granted with the Indiana Family Health Council ("IFHC"), which in turn has sub-granted to PPIN to provide the services to its patients. At the current time the Title V grant to PPIN totals $368,679.00 and the Title XX grant to PPIN totals $263,497.00. Both grants do not expire until September 30, 2011. However, PPIN (including entities that would become PPIN) has received Title V monies continuously since 1968 and Title XX monies continuously since at least 1991. Save for the enactment of the legislation that is challenged at present, PPIN therefore anticipates the continued receipt of funds even beyond the current grant period. At its eight (8) clinics funded by grants utilizing federal monies (including monies received through Title X of the Social Security Act, 42 U.S.C. § 300, *et seq.*, which is not affected by HEA 1210, but not including monies provided through the DIS grant), PPIN provided care and services to 15,523 patients in 2010.

PPIN takes all steps necessary to ensure that funds it receives through state and federal programs are not commingled with private funds that it utilizes to perform abortions and to provide abortion-related services. Indeed, PPIN is audited annually by an independent auditing firm and routinely by IFHC to ensure, among other things, that these funds are not commingled. Each audit has revealed that no such commingling occurs.

*D. The Effect of HEA 1210 on Planned Parenthood of Indiana*

The monies that PPIN receives from these grants and from the Medicaid program pass through both the Indiana Department of Administration and the Indiana State Budget Agency. The loss of these monies will be devastating to PPIN's ability to provide necessary services to its

patients. PPIN estimates that the statute will cause it to lose more than $2,000,000.00 annually. This will cause approximately thirteen (13) health centers to be closed and approximately fifty-two (52) full-time positions to be lost, causing massive layoffs of employees, including both staff employed at the closing health centers and a variety of administrative staff. These more than fifty-two (52) full-time positions represent more than a third of PPIN's current full-time staff. Most significantly, 33,577 patients—who receive services at the health centers that are set to be closed—will lose their health care provider of choice. The loss of these monies will be crippling.

II.    STATEMENT OF FACTS RELATED TO COUNT TWO (COMPELLED SPEECH PROVISIONS)

PPIN limits its abortion services to women who are no later than the end of their first trimester of pregnancy. This is defined as twelve (12) weeks from fertilization.[3] Fetal age is determined by the performance of an ultrasound. In fact, in Indiana, ISDH reports that at least 92% of all abortions are first-trimester abortions. The only facility in Indiana providing abortions after the first trimester is a clinic at Wishard Memorial Hospital in Indianapolis called the Well Women's Center.

Indiana law provides that, prior to the performance of an abortion, the pregnant woman must receive certain information as part of the informed consent process. This is provided by the physician or the physician's designate, which can include a licensed midwife. IND. CODE § 16-34-2-1.1(a)(1). Dr. Michael King, M.D., provides abortion and abortion-related services for PPIN patients in Marion County, Monroe County, and Tippecanoe County at facilities owned and operated by PPIN. He does not provide abortions elsewhere and all abortions that he performs are for women in the first trimester of their pregnancies. Carla Cleary, C.N.M., is a

---

[3]   As the precise date of fertilization is usually impossible to know, practitioners, including PPIN, generally date pregnancy from the first day of the woman's last menstrual period, which is generally two weeks before fertilization. Thus, PPIN performs no abortions beyond 14 weeks from the first day of the last menstrual period, which is 12 weeks post fertilization.

certified nurse midwife, as defined by Indiana law (and licensed as such under Indiana law), who provides the informed consent information to PPIN patients receiving abortion services from PPIN in Marion County, Indiana.  This responsibility has been delegated to her by the physician who is to perform the abortion(s) or the referring physician in accordance with Indiana Code § 16-34-2-1.1(a)(1).  Dr. King also provides the informed consent information to PPIN patients receiving abortion services.  If informed consent is not given as required by Indiana law, the consent is not valid and PPIN and its employees and contractors are subjected to criminal liability.  IND. CODE § 16-34-2-7.  This could also lead to the loss of PPIN's funding.  IND. ADMIN. CODE tit. 410, r. 26-2-28.

While there is debate in the scientific community about whether it is possible for a fetus to perceive pain much later in pregnancy, the objective medical evidence is uniform that an embryo or fetus cannot feel pain during the first trimester of pregnancy.  That is because, even if pain perception were possible in the late second or third trimester, the necessary neurological development is simply not in place in the first trimester of pregnancy.  PPIN, Dr. King, and Ms. Cleary thus strongly object to having to inform their patients that "objective scientific information shows that a fetus can feel pain at or before twenty (20) weeks of postfertilization age," which their patients will interpret as saying that the embryo or fetus can perceive pain during the first trimester.  To the extent that this statement conveys the suggestion that an embryo or fetus can feel pain in the first trimester, it is false.  To the extent that it conveys information about a fetus at twenty (20) weeks postfertilization to women in their first trimester, it is irrelevant regardless of its scientific validity.

PPIN, Dr. King, and Ms. Cleary also strongly object to being required to inform their patients that "human physical life" begins at conception.  They do not believe this to be true.

Science cannot answer the question of what human physical life is, for the term has no scientific meaning and a person's view of when human physical life begins depends on how an individual defines the term. Some people believe that life begins at birth, while others believe that it begins at conception. Cells—including both sperm and ovum cells—are "alive" long before an egg is fertilized. All cells can be traced back to the first cell ever created three billion years ago. On the other hand, if life is defined as something requiring sentience, then life cannot exist until there is higher brain function, which occurs long after conception. Therefore, the term "human physical life" is not a scientific or medical term at all, but a philosophical or religious concept that is not a fact, but a position or belief of the State of Indiana. This is not a position or belief in which PPIN, Dr. King, or Nurse Cleary share, and they therefore object to being compelled to say this to their patients.

### THE PLAINTIFFS WILL PREVAIL ON THE MERITS OF THEIR LEGAL CLAIMS

### Part One: Count One – Defunding Provisions

I.    INDIANA CODE § 5-17-22-5.5 (EFFECTIVE MAY 10, 2011) VIOLATES THE CONTRACT CLAUSE OF THE UNITED STATES CONSTITUTION TO THE EXTENT THAT IT APPLIES TO CONTRACTS ENTERED INTO PRIOR TO THE EFFECTIVE DATE OF THE STATUTE.[4]

The Contract Clause of the United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Scrutiny under this provision has two (2) parts. First, the Court must determine "whether the state law has

---

[4] As indicated previously, funding for PPIN's grants under Title V and Title XX pass from the State to a nonprofit organization called the Indiana Family Health Council, Inc. ("IFHC"), which has subgranted to PPIN. On information and belief, the State interprets the relevant provisions of HEA 1210 as applying to these grants, notwithstanding the existence of an intermediary that does not perform abortions or maintain or operate a facility at which abortions are performed. The challenged statute, however, only prohibits agencies of the State from entering into contracts with or making grants to organizations such as PPIN, IND. CODE § 5-22-17-5.5(b), and only prohibits direct appropriations to pay for these obligations, IND. CODE § 5-22-17-5.5(c). This Court may wish to avoid many of the constitutional and federal statutory issues presented by this case by simply holding that HEA 1210 does not apply to PPIN's grants under Title V and Title XX. However, because PPIN's grant under 42 U.S.C. § 247c, *et seq.*, is made directly with the Indiana State Department of Health and involves appropriations made directly to PPIN, these issues may not be avoided entirely.

in fact operated as a substantial impairment of a contractual relationship." *San Diego Police Officers' Ass'n v. San Diego City Employees' Retirement Sys.*, 568 F.3d 725, 736 (9th Cir. 2009) (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983)). And second, the Court must then examine whether the "[l]aws that substantially impair state or local contractual obligations are . . . 'reasonable and necessary to serve an important public purpose.'" *Id.* at 737 (quoting *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 25 (1977)).

It cannot be seriously disputed that the defunding provisions of HEA 1210 substantially impair the contractual relationship between PPIN and various state agencies or an intermediary sub-grantor.   Under each of the contracts described above, PPIN has undertaken to provide specified services in exchange for grant monies for which it has been approved (or Medicaid money, in the case of its enrollment in the Medicaid program).   HEA 1210, however, prohibits the parties with whom PPIN has contracted from making any payments due PPIN under those contracts.  This is more than impairment: it renders the contracts a nullity.  *See, e.g.*, *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992) ("If any subsequent law affect to diminish the duty, or to impair the right, it necessarily bears on the obligation of the contract.") (citation omitted). Given both (a) the dramatic extent to which HEA 1210 impairs PPIN's contractual relationships and (b) the principle that "[t]he severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected," *Energy Reserves Group*, 459 U.S. at 411, the State has a large hurdle to overcome in order to justify the statute.

Traditionally, the second prong of the Contract Clause analysis focuses on the extent to which the contractual impairment "is based upon reasonable conditions and is of a character appropriate to [a significant and legitimate] public purpose justifying the legislation's adoption." *Id.* at 412 (quoting *U.S. Trust Co.*, 431 U.S. at 22) (alterations omitted).   The present case,

however, does not require this Court to resolve whether the State's stated interest in discriminating against abortion providers constitutes "a significant and legitimate public purpose," nor does it require this Court to decide whether the refusal to fund services unrelated to the provision of abortions (or abortion-related services) is sufficiently related to the State's purported "public purpose" to justify the defunding of PPIN.[5] This is because the State is the direct party to the contracts at issue in this case or the initial party in contracts resulting in subcontracts with PPIN. For obvious reasons, "a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives," *U.S. Trust Co.*, 431 U.S. at 30–31; "[s]imilarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well," *id.* at 31.[6] The United States Supreme Court "has regularly held that the States are bound by their debt contracts," *id.* at 24; *see also id.* at 24 n.22 (collecting cases), and the same principle applies in this case: a State may not avoid its financial obligations by passing legislation that declares its avoidance of its own financial obligations. *See Energy Reserves Group*, 459 U.S. at 412 n.14 ("When a State itself enters into a contract, it cannot simply walk away from its financial obligations. In almost every case the Court has held a governmental unit to its contractual obligations when it enters financial or other markets.") (citing several cases).

---

[5] The State may not argue that it has an interest in simply controlling its own expenditures. After all, "[a] governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." *U.S. Trust Co.*, 431 U.S. at 25. *Cf. City of El Paso v. Simmons*, 379 U.S. 497, 509 (1965) (The Contract Clause "precludes a construction which would permit the state to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them.").

[6] For instance, the State could (and no doubt will) continue to simply refuse to fund abortions and abortion-related services. This is an "evident and more moderate course" for the State to take than cancelling all contracts for family planning services that have been entered into with PPIN. *See U.S. Trust Co.*, 431 U.S. at 30 n.28 (explaining alternatives that do not "reduce[] the covenant to a nullity").

To the extent that HEA 1210 applies to contracts executed prior to its effective date, the statute is unconstitutionally violative of the Contract Clause of the United States Constitution.

II.   INDIANA CODE § 5-22-17-5.5 (EFFECTIVE MAY 10, 2011) IS VIOLATIVE OF FEDERAL LAW TO THE EXTENT THAT IT APPLIES TO PPIN'S MEDICAID CONTRACT AND FUNDING.

   A.  *Background to federal Medicaid law.*

Medicaid is a cooperative federal-state program through which the federal government provides financial aid to states that furnish medical assistance to eligible low-income individuals. *See* 42 U.S.C. § 1396, *et seq.*; *Atkins v. Rivera*, 477 U.S. 154, 156 (1986).  Although state participation is voluntary, states electing to participate in the program are required to comply with certain statutory requirements imposed by federal law, as well as with regulations promulgated by the United States Department of Health and Human Services.  *See Evergreen Presbyterian Ministries, Inc. v. Hood*, 235 F.3d 908, 915 (5th Cir. 2000).  To qualify for federal assistance, therefore, "a state must submit to the [federal government] and have approved a 'state plan' for 'medical assistance' that contains a comprehensive statement describing the nature and scope of the state's Medicaid program."  *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 586 (5th Cir. 2004) (citations omitted).  Indiana participates in the Medicaid program and is therefore bound by all of its requirements. *See* IND. CODE § 12-15-1-1, *et seq.*

Among other things, the state plan must provide that "any individual eligible for medical assistance may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23).  This statutory subsection thus "provides that recipients may obtain services from any qualified Medicaid provider that undertakes to provide the services to them." 42 C.F.R. § 431.51(a)(1); *see also* 42 C.F.R. § 431.51(b); IND. ADMIN. CODE tit. 405, r. 1-1-2.  Although a state may under certain circumstances obtain a waiver from this so-called

"freedom of choice" provision of the Medicaid Act for demonstration projects, Indiana's state plan—which establishes its agreement with the federal government—specifies that persons in the Indiana demonstration projects have free choice concerning their selection of providers of family planning services. *See* INDIANA MEDICAID PLAN § 4.10, *available at* http://provider.indiana medicaid.com/ihcp/StatePlan/Section_4/4.10.pdf (last visited May 5, 2011).

 *B.   HEA 1210, as enacted, is violative of the freedom of choice requirements.*[7]

As enacted, HEA 1210 prohibits PPIN from receiving Medicaid reimbursement for services that would otherwise be reimbursable under the Medicaid program. As such, Letitia Clemons and Dejiona Jackson are prohibited from obtaining care and treatment through her provider of choice, PPIN. This is so notwithstanding the fact that PPIN has been deemed by the Medicaid agency to be "qualified" to provide these services since shortly after the inception of the program, and remains qualified to perform Medicaid-reimbursable services. The de-funding provisions of HEA 1210 represent a blatant violation of the "freedom of choice" provision of the Medicaid Act.

Of course, "settled principles of statutory construction" require this Court to "first determine whether the statutory text is plain and unambiguous" and, "[i]f it is, [to] apply the statute according to its terms." *Carcieri v. Salazar*, 555 U.S. 379, ___, 129 S.Ct. 1058, 1063–64 (2009). There is, however, nothing ambiguous about the language of 42 U.S.C. § 1396a(a)(23): with certain statutory exceptions not applicable here: (a) an individual eligible for Medicaid assistance; (b) must be permitted to obtain such assistance; (c) from any institution, agency,

---

[7] Of course, an initial question with any claim brought pursuant to 42 U.S.C. § 1983 ("Section 1983") to enforce a federal statute is whether that statute confers a right enforceable through Section 1983. *See generally Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002). Courts have, with virtual unanimity, concluded that 42 U.S.C. § 1396a(a)(23) confers such a right on individuals enrolled in the Medicaid program such as Ms. Clemons and Ms. Jackson. *See, e.g., Harris v. Olszewski*, 442 F.3d 456, 463–65 (6th Cir. 2006); *G. ex. rel. K. v. Hawaii Dep't of Hum. Resources*, 2009 WL 1322354, at *11–12 (D. Hawaii May 11, 2009); *Women's Hosp. Found. v. Townsend*, 2008 WL 2743284, at *8 (M.D. La. 2008); *cf. Ball v. Rodgers*, 492 F.3d 1094, 1109 (9th Cir. 2007) (adopting the analysis of the Sixth Circuit in *Harris* although addressed to a different provision).

community pharmacy, or person; (d) qualified to perform the service or services; (e) who undertakes to provide such services.

Clearly Ms. Clemons, Dejiona Jackson, and PPIN meet all requirements of this statute, and the refusal to provide Medicaid reimbursement for services offered by PPIN constitutes a violation of the plaintiffs' rights under federal law. As the United States Supreme Court has made clear, this statute "gives [Medicaid] recipients the right to choose among a range of *qualified* providers, without government interference." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785 (1980) (emphasis in original). That is, "it . . . confers an absolute right to be free from government interference with the choice to [receive services from a provider] that continues to be qualified." *Id.*[8]

Moreover, this reading of the statute also receives support from the interpretation of the Medicaid Act by the Indiana Family and Social Services Administration, which administers the Medicaid program in Indiana. *See* Legislative Services Agency, Fiscal Impact Statement (HB 1210) (Apr. 19, 2011), at 2 (available at http://www.in.gov/legislative/bills/2011/PDF/FISCAL/HB1210.008.pdf). To the extent that HEA 1210 applies to Medicaid funding received by PPIN, it is illegal and must be enjoined.

---

[8] *See also, e.g.*, *Chisholm v. Hood*, 110 F.Supp.2d 499, 506 (E.D. La. 2000) (A state's "limitation[] on these services violate[s] class members' federally mandated right to choose from a variety of providers, allowing them to get services from any institution, agency, community, pharmacy, or person[] qualified to provide them who undertakes to do so. . . . States must allow all qualified providers to participate in Medicaid.") (internal quotations omitted); *King v. Sullivan*, 776 F.Supp. 645, 655 (D.R.I. 1991) ("When several qualified providers of a service exist, the state may not dictate where a Medicaid recipient is to receive treatment."); *Briarcliff Haven, Inc. v. Dep't of Human Res.*, 403 F.Supp. 1355, 1362 (N.D. Ga. 1975) ("The free choice of provider requirement is designed to assure each Medicaid recipient a free choice among qualified providers of medical assistance and to guarantee that the state will not dictate to any Medicaid recipient where he or she must receive treatment."); *Bay Ridge Diagnostic Lab, Inc. v. Dumpson*, 400 F.Supp. 1104, 1106–08 (E.D.N.Y. 1975) (The federal government, "consistent with the statements in the House and Senate reports [concerning the enactment of the Medicaid program], has always interpreted Section 1396a(a)(23) to assure freedom of choice as to all qualified providers of medical services willing to render services in accordance with the fee schedules established by the state.").

~ 15 ~

III.   INDIANA CODE § 5-22-17-5.5 (EFFECTIVE MAY 10, 2011) IS PREEMPTED BY FEDERAL LAW TO THE EXTENT THAT IT APPLIES TO PPIN'S GRANTS.[9]

A.  *Background to the Federal Programs at Issue aside from Medicaid*

At issue in this case are grants that have been and will be awarded to PPIN under three (3) federal programs (in addition to the Medicaid program, which is treated separately above): the Sexually Transmitted Diseases Prevention and Control Grant Program, 42 U.S.C. § 247c, *et seq.* ("STD Program"); Title V of the Social Security Act, 42 U.S.C. § 701, *et seq.* ("Title V"); and Title XX of the Social Security Act, 42 U.S.C. § 1397, *et seq.* ("Title XX").

1.  STD Program

The STD Program is a program utilizing exclusively federal monies through which the federal government makes grants to states, political subdivisions of states, and other public or nonprofit entities for, *inter alia*, sexually transmitted diseases screening and treatment activities, referrals for necessary medical services, and studies or demonstrations to evaluate or test sexually transmitted diseases prevention and control strategies and activities.   42 U.S.C. § 247c(c).  Upon awarding the funds, the federal government may "impose additional conditions, including conditions governing the use of information or consent forms, when, in the [federal government's] judgment, they are necessary to advance the approved program, the interest of public health, or the conservation of grant funds."  42 C.F.R. § 51b.106(e).

2.  Title V

Title V is a program utilizing exclusively federal monies through which the federal government makes grants to implement programs designed to "improve the health of all mothers

---

[9] As noted above, this Court may avoid reaching the merits of the plaintiffs' preemption claims – at least to the extent that these claims allege preemption by Title V and Title XX of the Social Security Act – by simply finding that HEA 1210 does not apply to these grants insofar as grant funds are not disbursed directly from the State to PPIN. However, this Court may not avoid reaching the merits of the plaintiffs' preemption claim to the extent that it alleges preemption by the STD Program, in which grant funds pass directly from the State to PPIN (and which is therefore clearly affected).  *See supra* note 4.  Additionally, this claim is every bit as applicable to PPIN's enrollment in the Medicaid program as it is to its federally funded grants.

and children." 42 U.S.C. § 701(a). Through these grants, states are enabled, *inter alia*, "to provide and to assure mothers and children access to quality maternal and child health services," "to reduce infant mortality and the incidence of preventable diseases and handicapping conditions among children," and "to provide and to promote family-centered, community-based, coordinated care for children with special health care needs and to facilitate the development of community-based systems of services for such children and their families." 42 U.S.C. § 701(a)(1). In order to receive these grants, states must prepare and transmit to the federal government an application containing (among other things) a statewide needs assessment, a plan for meeting these needs, a fair method for allocating funds allotted to the State, and a provision that the State will coordinate the implementation of Title V funds with the implementation of related programs. 42 U.S.C. § 705(a). Finally, Title V specifies several categories of activities for which grant funds may not be used. 42 U.S.C. § 704(b).

    3.  Title XX

  Title XX is a program utilizing exclusively federal monies through which the federal government makes grants to implement programs designed to improve numerous aspects of social services. 42 U.S.C. §§ 1397, 1397a(a). The applicable social services include family planning services, training and related services, and information, referral, and counseling services. 42 U.S.C. § 1397a(a)(2)(A). Prior to the expenditure of any Title XX funds, a participating state must report to the federal government on the "intended use of the payments the State is to receive," including "information on the types of activities to be supported and the categories or characteristics of individuals to be served." 42 U.S.C. § 1397c. Like Title V, Title XX also specifies several categories of activities for which grant funds may not be used (absent a waiver obtained from the federal government). 42 U.S.C. § 1397d(a).

*B.  HEA 1210 is preempted by Medicaid and the other federal laws at issue.*

### 1.  Basic Principles of Preemption

By virtue of the Supremacy Clause of the United States Constitution, U.S. CONST. art. VI, § 2, "it is a fundamental principle of the Constitution . . . that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). This requires an examination of congressional intent, and federal regulations have no less preemptive effect than federal statutes. *Fid. Fed. Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 152–53 (1982). A state statute may thus be preempted in three (3) ways: "by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (citations omitted).

This last category of preemption—"implied conflict preemption"—occurs when "compliance with both federal and state regulations is a physical impossibility" or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983) (internal quotation omitted). It is this  type of preemption at issue in this case.

### 2.  HEA 1210 is preempted by the federal Medicaid Act.

In addition to violating the freedom of choice provisions of federal law, *supra,* HEA 1210 is obviously preempted to the extent it attempts to block that freedom of choice. It clearly conflicts with Congressional purposes and objectives. Other aspects of the Medicaid law point to preemption as well. Given that the plaintiffs have described this program above, there is no need to once again delve into the specifics of this program other than to reiterate that the federal statute imposes comprehensive requirements on participants and that Indiana is not free to add its

own requirements and exclusions with regard to participation.  However, the preemption of Indiana Code § 5-22-17-5.5 is even more glaring in this context for the following reason: while this law prohibits funding for organizations that perform *any* abortions, some abortions—those necessary to protect the life of the pregnant woman and those performed in cases of rape or incest—are actually covered services under Medicaid.  *See Harris v. McRae*, 448 U.S. 297, 302 – 03 (1980) (explaining the so-called Hyde Amendment); *Humphreys v. Clinic for Women, Inc.*, 796 N.E.2d 247, 250 (Ind. 2003) (explaining coverage in Indiana and ultimately upholding this limitation against state constitutional challenge).  *Cf.* IND. CODE §§ 12-15-5-1(17), 16-34-1-2; IND. ADMIN. CODE tit. 405, r. 5-28-7.  Thus, Indiana Code § 5-22-17-5.5 prohibits Medicaid funding from flowing to organizations or entities that provide services that *must* be covered under the Medicaid program.  This statute cannot stand.

### 3.  HEA 1210 is preempted by the other potential federal laws at issue.

Federal law explicitly details both allowable uses of the funds obtained through each federal program at issue in this case and the uses for which grant funds may not be put.  *See* 42 U.S.C. § 247c(c) (allowable uses for STD Program funds); 42 U.S.C. § 701(a)(1) (allowable uses for Title V funds); 42 U.S.C. § 704(b) (non-allowable uses for Title V funds); 42 U.S.C. § 1397a(a)(2)(A) (allowable uses for Title XX funds); 42 U.S.C. § 1397d(a) (non-allowable uses for Title XX funds).  Of course, these statutes do not provide that grant funds may not be used to fund otherwise qualifying services that are provided by organizations that happen to also perform abortions.  Given that grant funds received under these statutes have been, are being, and will be utilized by PPIN only to perform qualifying services and care, HEA 1210 stands as a substantial "obstacle to the accomplishment and execution of the full purposes and objectives of congress." *Pac. Gas & Elec. Co.*, 461 U.S. at 204.

In the context of federal spending statutes, the United States Supreme Court has held, without equivocation, that

> There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid.

*King v. Smith*, 392 U.S. 309, 333 n.34 (1968). The Court has thus on multiple occasions rejected state attempts to add eligibility requirements to federal funding statutes. *See, e.g.*, *Carleson v. Remillard*, 406 U.S. 598, 604 (1972); *T.H. v. Jones*, 425 F.Supp. 873, 875–76 (D. Utah 1975) (three-judge panel), *summarily aff'd*, 425 U.S. 986 (1976).

These principles have subsequently been applied by the lower courts to statutes that bear a striking resemblance to HEA 1210. In *Planned Parenthood of Central Texas v. Sanchez*, 280 F.Supp.2d 590, 604 (W.D. Tex. 2003), *remanded with instructions*, 403 F.3d 324 (5th Cir. 2005), for instance, the district court addressed a state-law provision that state funds under, *inter alia*, Title XX and the Medicaid program could not be "distributed to individuals or entities that perform elective abortion procedures." *Id.* at 593. After surveying existing case law, the court concluded that "[t]hese cases establish that a state cannot withhold funds from providers who me[e]t the federal eligibility requirements simply because the providers do not meet the state's additional requirement." *Id.* at 604. On appeal, the Fifth Circuit reiterated that "[i]t is the prerogative of Congress, within limits, to attach conditions to federal funds" and accordingly held that "a state eligibility standard that altogether excludes entities that might otherwise be eligible for federal funds is invalid under the Supremacy Clause." 403 F.3d at 336–37.[10] In

---

[10] In *Sanchez*, the Fifth Circuit nonetheless held that the statute at issue could be saved because it did not restrict the right of entities performing abortions to create separate affiliates and thereby divide into "family planning" entities and "abortion" entities. 403 F.3d at 341–42. It is unclear whether the Indiana statue is susceptible to a similar interpretation. However, this portion of the court's holding was in error: a state statute is either preempted by

*Planned Parenthood of Billings, Inc. v. State of Montana*, 648 F.Supp. 47 (D. Mont. 1986), the court similarly concluded that a state statute prohibiting federal funds from being disbursed to entities that perform abortions was preempted by Title X of the Social Security Act, 42 U.S.C. § 300, *et seq.* ("Title X").   648 F.Supp. at 51 (The statute, "at the very minimum, stands as an obstacle to the execution of the full purposes of Congress. . . .   [It] adds an impermissible condition of eligibility for federal funding . . . in violation of the Supremacy Clause.").[11]

Several courts have thus held state statutes adding eligibility criteria for the receipt of funds under Title X to be preempted by federal law.   *See, e.g., Valley Family Planning v. North Dakota*, 661 F.2d 99, 100–01 (8th Cir. 1981) (state statute prohibiting federal monies from flowing to an entity that "performs abortions []or encourages its clients to obtain abortions" preempted by Title X); *Planned Parenthood Ass'n of Utah v. Matheson*, 582 F.Supp. 1001, 1006–07 (D. Utah 1983) (state statute requiring parental notification before a minor could be provided with contraceptives preempted by Title X); *Doe v. Pickett*, 480 F.Supp. 1218, 1220–21 (D.W. Va. 1979) (same).   And, addressing a related issue, the D.C. Circuit has held that, "[a]lthough Congress is free to establish eligibility requirements for recipients of Title X funds, Congress has not delegated that power to the states.   Title X does not provide, or suggest that states are permitted to determine eligibility criteria for participants in Title X programs." *Planned Parenthood Fed. of Am. v. Heckler*, 712 F.2d 650, 663 (D.C. Cir. 1983) (holding invalid as exceeding its authority a regulation of the U.S. Department of Health and Human Services

---

federal law or it is not preempted by federal law, and there is no jurisprudential (or statutory) support for the proposition that a state statute is not fatally preempted simply because an altogether different legal entity may be created that would be unaffected by the statute.

[11] Although not addressing a preemption claim, the Supreme Court in *Rust v. Sullivan*, 500 U.S. 173 (1991), noted as follows: "The Title X grantee can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it simply is required to conduct these activities through programs that are separate and independent from the project that receives Title X funds." *Id.* at 196 (emphasis removed) (citation omitted). Although *Rust* specifically addressed Title X, the same description is every bit as applicable to Title V and Title XX.

that would have required Title X grantees to notify the guardians of unemancipated minors when prescription contraceptives were provided). These holdings are every bit as applicable to the grants at issue in this case, which in many respects are functionally equivalent to Title X.

Each of the federal statutes at issue thus explicitly restricts the use of grant funds for certain enumerated purposes (none of which are applicable here). *See* 42 U.S.C. § 704(b) (Title V); 42 U.S.C. § 1397d(a) (Title XX). Indeed, the STD Program goes so far as to clearly provide a limited number of circumstances in which the *federal government* may impose additional conditions on the receipt of funds. *See* 42 C.F.R. § 51b.106(e). This provision would be utterly meaningless were states permitted to impose such conditions for any reason they so chose. *See, e.g., Ward v. Race Horse*, 163 U.S. 504, 508 (1896) (interpreting a statute to render a provision meaningless violates "the cardinal rule of interpretation"); *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) ("We avoid interpreting a statute in a way that renders a word or phrase redundant or meaningless."). Clearly Congress did not intend for entities performing abortions to be categorically ineligible for these funds; if it had, it could have easily included these entities in its description of the restricted uses of funds. The law is clear: the State has no authority to add eligibility requirements for federal funds external to the congressionally sanctioned criteria of the federal programs itself. HEA 1210 must be enjoined.

IV.   INDIANA CODE § 5-22-17-5.5 (EFFECTIVE MAY 10, 2011) IMPOSES AN UNCONSTITUTIONAL CONDITION ON PPIN'S RECEIPT OF STATE FUNDS AND FEDERAL FUNDS THAT PASS THROUGH THE STATE.

Finally, the defunding provisions of HEA 1210 impose a choice on PPIN: forego non-abortion-related funding, to the detriment of numerous employees and thousands of patients, or cease providing abortions. In many contexts the Supreme Court has noted that "[n]either Congress nor the states may condition the granting of government funds on the forfeiture of

constitutional rights." *Planned Parenthood of Mid-Missouri & E. Kansas, Inc. v. Dempsey*, 167 F.3d 458, 461 (8th Cir. 1999) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), *Shapiro v. Thompson*, 394 U.S. 618, 634–35 (1969), and *Speiser v. Randall*, 357 U.S. 513, 518–19 (1958)). The rationale behind the "unconstitutional conditions" doctrine

> is premised on the notion that what a government cannot compel it should not be able to coerce. "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.'" *Perry v. Sindermann*, 408 U.S. at 597 . . . . Accordingly, "[t]he denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly." *Elrod v. Burns*, 427 U.S. at 361 . . .

*Libertarian Party of Indiana v. Packard*, 741 F.2d 981, 988–89 (7th Cir. 1984). "[F]unding classifications that interfere with the exercise of constitutional rights must be 'necessary to promote a *compelling* governmental interest.'" *Dempsey*, 167 F.3d at 459 (quoting *Thompson*, 394 U.S. at 634) (emphasis in *Dempsey*).

The first step in the unconstitutional condition analysis is to determine the constitutionally protected activity in which PPIN is engaged. As the Supreme Court noted in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 869 (1992), there "is a constitutional right of . . . [a] woman to have some right to terminate her pregnancy." Although the Court has not explicitly held that the person performing the abortion has a similar or derivative constitutional right to perform abortions, it has certainly intimated that the constitutional concerns in this regard are shared by the persons conducting the abortions. One way that this shared concern is expressed is in the cases that specifically note that the relationship between physician and abortion patient is so intertwined that the physician can raise the interests of the patient. *See, e.g., Singleton v. Wulff*, 428 U.S. 106, 118 (1976) (plurality

opinion) ("[W]e conclude that it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision.").

The basis for allowing the physician to step forward is that, when restrictions are placed on the practitioner, "[t]he woman's exercise of her right to an abortion, whatever its dimension, is therefore necessarily at stake." *Singleton*, 428 U.S. at 117. In *Webster v. Reproductive Health Services*, 492 U.S. 490 (1989), the Court rejected the argument that a state law was unconstitutional that made it unlawful for any public facility to be used to perform abortions not necessary to save the woman's life given that the woman could seek abortions in other non-publicly funded facilities. *Id.* at 509. However, in so doing, the Court noted that "[t]his case might also be different if the State barred doctors who performed abortions in private facilities from the use of public facilities for any purpose." *Id.* at 510 n.8. Of course, in this situation the rights of the woman would not be altered, for she could go to the exact same private facilities noted by the Court. The persons who would be injured in the situation hypothesized by the Court would be the doctors barred from using public facilities for non-abortion-related purposes simply because they also performed abortions in the private facilities.

This, of course, is the situation in which PPIN now finds itself. It can still provide abortions in its private facilities. However, it has been barred from the receipt of public funds even for non-abortion-related purposes. The citation given by the Supreme Court immediately following its hypothetical in *Singleton* is to *Harris v. McRae*, 448 U.S. at 317 n.19. In *McRae*, the Court stated that "[a] substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate exercised her constitutionally protected freedom to terminate her pregnancy by abortion." *Id.* This, of course, would be an unconstitutional condition.

It thus appears that the Court has recognized that the abortion provider, as well as the patient, can claim an unconstitutional condition if it is denied public benefits simply because the entity provides abortions with non-public funds.[12]  This was the conclusion of the Eighth Circuit in *Dempsey*.  In that case, a state law prohibited abortion providers from receiving state funding for non-abortion related family planning services.  The court found that the particular state law was ambiguous and could be construed as allowing state funds to continue to go to an entity that was separate from, but affiliated with, an abortion provider.  167 F.3d at 462–64.  However, absent this interpretation, the law would be an unconstitutional condition.  The law would "cross the line" established by the Supreme Court "and hence be an unconstitutional condition," burdening "Planned Parenthood's constitutional rights."    *Id.* at 463–64.    It would "unconstitutionally restrict[] grantee activities."   *Id.* at 462.   The key to this analysis is the conclusion that Planned Parenthood has an independent constitutional right concerning abortions.

Similarly, the Ninth Circuit, in *Planned Parenthood of Central & Northern Arizona v. Arizona*, 718 F.2d 938 (9th Cir. 1983), was faced with a footnote in an Arizona appropriations statute that prohibited state monies from going to nongovernmental organizations providing abortions.  The court noted that "the State of Arizona may not unreasonably interfere with the right of Planned Parenthood to engage in abortion."  *Id.* at 944.  It further stated that "it is not clear that the statute was drawn as narrowly as possible to permit the State to control use of its funds while infringing minimally on exercise of constitutional rights."  *Id.* at 945.  However, it

---

[12] In *Rust v. Sullivan, supra,* the Court found that federal regulations that provided that projects funded by Title X funds could not use the funds for abortion counseling did not amount to an unconstitutional condition because the grantees could continue to engage in abortion-related activities, although they could not use Title X funds to do so. 500 U.S. at 196.  Said the Court: "[O]ur 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy, rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program."  *Id.* at 197 (emphasis in original).  Of course, in this situation the State of Indiana has placed conditions not on the use of public monies, but on the recipient of the monies (PPIN) itself.

reversed the district court's decision invalidating the defunding provision and remanded the case to determine the factual matter of whether the statute was, in fact, drawn as narrowly as possible given that Arizona argued that it was not possible to determine whether the funds were being used by Planned Parenthood for abortions or not. *Id.* at 945–46.

In *Planned Parenthood of Central Texas v. Sanchez*, 280 F.Supp.2d 590 (W.D. Tex. 2003), *remanded on other grounds*, 403 F.3d 324 (5th Cir. 2005), a challenge was brought to a Texas statute (Rider 8)  that, like Indiana's, prohibited organizations providing elective abortions from receiving any Medicaid, Title XX, or Title X funds for non-abortion related services. In granting the preliminary injunction, the trial court found that the statute imposed unconstitutional conditions on the providers.  After reviewing the relevant case law, the court found as follows:

> While the precedent is far from clear, this Court reads the language of the above Supreme Court opinions to acknowledge abortion providers have some constitutionally-protected right, derived from their patients' rights, to perform the services that are necessary to enable women to exercise their own constitutional rights.  This derivative right stems from the fact that, as abortion providers who help women to realize their constitutional rights safely, the Plaintiffs are in a unique position to assert their patients' constitutional rights.  Therefore, the Court holds the Plaintiffs are engaging in a constitutionally protected activity.

*Id.* at 608.  The court therefore concluded that "[b]ecause Rider 8 withholds funding from the Plaintiffs because they engage in a constitutionally protected activity, it creates an unconstitutional condition." *Id.*

The same is true here.  The challenged statute punishes PPIN for engaging in a constitutionally protected activity.  The statute can therefore be allowed only if the State possesses a compelling interest. *Id.*  The only interest that can be surmised is that Indiana wishes to punish PPIN for engaging in abortions.  Obviously, it is not a compelling interest for the State to deny the constitutionally protected interest itself.  The statute represents an unconstitutional condition.

## Part 2: Count Two: Compelled Speech Provisions

I.    BACKGROUND TO COMPELLED SPEECH DOCTRINE

The First Amendment of the United States Constitution "includes both the right to speak freely and the right to refrain from speaking at all," and prohibits state action that would compel an individual to "disseminate ideology" that he or she would not otherwise endorse. *Wooley v. Maynard*, 430 U.S. 705, 714, 717 (1977); *see also Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) ("[L]eading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say."); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796–97 (1988) (holding that the First Amendment protects "the decision of both what to say and what not to say"); *Entertainment Software Assoc. v. Blagojevich*, 469 F.3d 641, 651 (7th Cir. 2006) (holding that where a statute "mandates speech that a speaker would not otherwise make that statute necessarily alters the content of the speech") (quotations and citations omitted). While the State may require certain factual disclosures incidental to the regulation of professional and commercial activities, it may not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). This constitutionally significant distinction between regulations that compel statements of verifiable fact as opposed to subjective ideas and metaphysical beliefs has been well recognized by the Supreme Court in various contexts, including speech in newspapers, commercial speech, student speech in public school, and professional speech. *See Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 573–74 (1995) (and cases cited therein).

In the context of informed consent provisions tied to state regulation of abortion providers, a "physician's First Amendment rights not to speak are implicated," subject to reasonable licensing and regulation. *Casey*, 505 U.S. at 884. Reasonable regulations may include requiring a physician to give "truthful, non-misleading information" to the patient, so long as it is relevant to the patient's decision to have an abortion. *Id.* at 882. In *Casey*, the Supreme Court upheld an informed-consent provision that required a physician to inform the woman of the nature of the procedure, the health risks of the abortion and of childbirth, and the probable gestational age of the embryo or fetus, where such information was both relevant to the health of the woman and her decision to have an abortion. *Id.* at 882–83. However, if the "State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming a courier for such message." *Maynard*, 430 U.S. at 717.

II.   AS APPLIED TO THE PLAINTIFFS, INDIANA CODE § 16-34-2-1.1(A)(1)(G) (EFFECTIVE JULY 1, 2011)—WHICH MANDATES THAT PHYSICIANS INFORM WOMEN SEEKING ABORTIONS THAT "OBJECTIVE SCIENTIFIC INFORMATION SHOWS THAT A FETUS CAN FEEL PAIN AT OR BEFORE TWENTY (20) WEEKS OF POSTFERTILIZATION AGE"—IS FALSE, MISLEADING, AND IRRELEVANT, AND IT DIRECTLY CONTRADICTS CONCLUSIVE SCIENTIFIC EVIDENCE ACCEPTED BY THE MEDICAL COMMUNITY.

Requiring a doctor to state that "objective scientific information shows that a fetus can feel pain at or before twenty (20) weeks of postfertilization age" violates the plaintiffs' First Amendment rights because, as applied to PPIN and its practitioners including Dr. King and Ms. Cleary, it is compelled speech of a false, misleading, and irrelevant statement.   "Objective scientific information" is defined by HEA 1210 as "data that have been reasonably derived from scientific literature and verified or supported by research in compliance with scientific methods." IND. CODE § 16-18-2-254.2 (effective July 1, 2011).

Based on a review of the relevant scientific literature, there is consensus that an embryo or fetus cannot perceive pain in the first trimester, which is generally defined as twelve (12) weeks postfertilization, and there are no published scientific opinions that claim otherwise. When, and if, a fetus can ever perceive pain during the course of a pregnancy is a matter of some debate.[13] However, what is clear, and what is relevant for the plaintiffs' as-applied challenge to the statute, is that there is *no* scientific authority claiming that pain perception is possible at twelve (12) weeks postfertilization.

PPIN only provides abortion services to women who are in their first trimester of pregnancy, that is, twelve (12) weeks postfertilization. There is no "objective scientific evidence," as defined by HEA 1210 or as understood by scientists, that an embryo or fetus can feel pain during the period of gestation when PPIN provides abortions. Yet, plaintiffs, over their objections, are required to inform patients that there is "objective scientific information" that a pain is possible at or before twenty (20) weeks, a message that, to be relevant, must be understood to mean that the woman's embryo or fetus might feel pain in the first trimester. This is certainly how the phrase "at or before twenty (20) weeks" will be perceived by a woman who is in the first trimester and hears this warning. Therefore, as applied to PPIN and its practitioners, the statement that "objective scientific information shows that a fetus can feel pain

---

[13]A definitive study published in the Journal of the American Medical Association (JAMA), conducted a multidisciplinary literature review of scientific studies on fetal pain and concluded that because pain is an "emotional and psychological experience" it requires consciousness, and "conscious perception of pain can arise only after the thalamocortical pathways begin to function, which may occur in the third trimester around 29 to 30 weeks' gestational age." Lee, Ralston, Drey, Partridge and Rosen, *Fetal Pain: A Systematic Multidisciplinary Review of the Evidence*, JAMA, 294(8), 947, 952 (2005). Thalamocortical fibers begin to grow at 23 to 30 weeks, and although these fibers are "necessary for pain perception, their mere presence is insufficient — this pathway must also be functional." *Id.* A 2010 study by the Royal College of Obstetricians and Gynecologists (Fetal Awareness: Review of Research and Recommendations for Practice, available at http://www.rcog.org.uk/fetal-awareness-review-research-and-recommendations-for-practice), noted "increasing evidence" that a fetus does not feel pain, regardless of its gestational age. But even the minority scientific opinion    that conscious pain perception is possible at the end of the second trimester, from about 20-22 weeks gestation    is likewise irrelevant to PPIN's practice.

at or before twenty (20) weeks of postfertilization age" is incorrect, misleading, and/or irrelevant, and constitutes impermissible compelled speech.

III.     INDIANA CODE § 16-34-2-1.1(A)(1)(E) (EFFECTIVE JULY 1, 2011)—WHICH MANDATES THAT PHYSICIANS INFORM WOMEN SEEKING ABORTIONS THAT "HUMAN PHYSICAL LIFE BEGINS WHEN A HUMAN OVUM IS FERTILIZED BY A HUMAN SPERM"—IS NOT A FACTUAL STATEMENT, IS MISLEADING, AND IS IRRELEVANT TO A WOMAN'S DECISION TO HAVE AN ABORTION.

The question of when human physical life begins goes to the heart of the moral, philosophical, and theological debate over abortion, and the Supreme Court has repeatedly refused to "adopt one theory of when life begins to justify its regulation of abortions." *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 444 (1983) (overruled on other grounds). In refusing to "resolve the difficult question of when life begins," the Court in *Roe v. Wade*, 410 U.S. 113 (1973), stated that "[w]hen those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer." *Id.* at 159. The Supreme Court, citing religious, philosophical, and legal sources, found that, in fact, "[t]here has always been strong support for the view that life does not begin until live birth." *Id.* at 159–62.

Similarly, in *Casey* the Supreme Court repeatedly refers, when speaking of an embryo or fetus, to the State's "interest in potential life," and scrupulously avoids describing it as an existing human life. *Casey*, 505 U.S. at 875–76; *see also Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) (noting that *Casey* recognized the importance of the "State's interest in potential life"). Here, this Court need not delve into the formidable debate over when life begins, but need only follow Supreme Court precedent that recognizes the question as a moral, theological, and philosophical one without any verifiable scientific or medical meaning. *See, e.g., Acuna v.*

*Turkish,* 930 A.2d 416 (N.J. 2007) (holding that in the context of common law informed-consent, the assertion that an embryo or fetus is "an existing, living human being" is not a biological or medical fact that a doctor has a duty to disclose before performing an abortion). Because the statement that human physical life begins at conception is an ideological statement and not a scientifically provable fact it cannot be truthful and therefore is impermissible compelled speech.

In *Planned Parenthood of Minnesota, North Dakota, and South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008), the Eighth Circuit addressed a similar state provision that required physicians to inform the woman seeking to have an abortion "[t]hat the abortion will terminate the life of a whole, separate, unique, living human being." *Id.* at 735. The court found that the statement "certainly may be read to make a point in the debate about the ethics of abortion," which would violate the First Amendment rule that a state "cannot compel an individual to speak the State's ideological message." *Id.* at 734-35. The court, however, was able to avoid the First Amendment problem because the statute specifically defined "human being" as "an individual living member of the species of Homo sapiens including the unborn human being during the entire embryonic or fetal ages from fertilization to gestation." *Id.* Reading the statement with the "narrow, species-based definition" provided by the law, the court upheld the informed-consent provision because it stated a biological fact, which was not contested by the plaintiffs in the case, that an "embryo or fetus is whole, separate, unique and living." *Id.* at 736.

Here, while the phrase "human physical life" has no scientific meaning, an attempt can be made to define the term by reference to Indiana statutory law, following the approach in *Rounds*. However, the legal definition of human life under Indiana law contradicts the assertion that human physical life begins at conception. After all, Indiana Code § 35-41-1-14 explicitly defines

a "human being" as "an individual who has been born and is alive."[14]  This statutory definition of "human" is supported by both civil and criminal law, which only recognizes a born and alive individual as being human.  *See, e.g., Bolin v. Wingert*, 764 N.E.2d 201, 205–07 (Ind. 2002) (holding that an eight- to ten-week-old fetus is not a child for purposes of Indiana's Child Wrongful Death Statute); *Baird v. State*, 604 N.E.2d 1170, 1189 (Ind. 1992) (holding that the Indiana feticide statute, IND. CODE § 35-42-1-6, is an "extension of the laws of homicide to cover the situation in which the victim is not a "human being" as defined by I.C. 35-41-1-14 . . . but a fetus").  Unlike the statute at issue in *Rounds* that gave a specific biological definition to the term "human being," which included both an embryo and a fetus, Indiana law defines a human as a "born and alive" person.  Therefore the statement that "human physical life begins when a human ovum is fertilized by a human sperm," before birth, is factually incorrect under Indiana law and states an unverifiable moral, religious, and philosophical viewpoint.

Furthermore, the statement that human physical life begins at conception is highly misleading to a woman seeking an abortion.  As already discussed, the question of whether human life begins at conception is at the very heart of the abortion debate and is a moral, religious, and philosophical inquiry rather than scientific inquiry.  Coming from a physician however, the statement, presented as fact, carries significant weight for a woman seeking an abortion, even if she did not previously share that belief.  A reasonable person seeking an abortion is likely to be aware of the moral significance the statement carries.  PPIN, Dr. King,

---

[14] Although Indiana Code § 35-41-1-14 uses the term "human being," the term is synonymous with the term "human," since "using the words together is considered a needless repetition (a tautology)." *McCauley v. State*, 15 Ind. App. 517, 521 n.1, 311 N.E.2d 430, 431 n.1 (1974) (citing Webster's Third New International Dictionary) (opinion on rehearing) (the same "Ind. App." citation for McCauley exists for both the original opinion and the opinion on rehearing; the "N.E.2d" citation differs for these two (2) opinions.).

and Nurse Cleary do not believe that human physical life begins at conception and are therefore impermissibly being compelled to promote a state ideology.

Finally, the statement that "human physical life begins when a human ovum is fertilized by a human sperm" is not at all relevant to the woman's decision to have an abortion. First, to the extent that the statement merely refers to the fact that a fertilized egg may some day develop into a fetus and then a fully-developed child, it is so self-evident that it could not possibly be useful to a pregnant woman seeking an abortion because the sole reason that she is seeking an abortion is *because* she knows that it could one day develop into a child. Second, the statement is in no way relevant to the nature of the procedure, any potential health risks, or the state's interest in regulating the practice of medicine. *Cf. Gonzales v. Carhart*, 550 U.S. 124 (2007) (holding that providing information concerning specific procedures involved in certain "partial-birth abortion" practices could be relevant to a woman's decision to have an abortion). Because the statement is not relevant to the woman's decision to have an abortion, the statement constitutes compelled speech.

### THE PLAINTIFFS ARE FACING IRREPARABLE HARM FOR WHICH THERE IS NO ADEQUATE REMEDY AT LAW

As indicated above, the plaintiffs are facing a variety of harms, including violation of their constitutional rights. The denial of constitutional rights is irreparable harm in and of itself. "Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 578 (6th Cir. 2002); *see also, e.g.*, *Cohen v. Coahoma County, Mississippi*, 805 F. Supp 398, 406 (N.D. Miss. 1992) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law."). Indeed, in the First

Amendment context, the Supreme Court has noted specifically that the violation of the First Amendment, for even "minimal periods of time," is "unquestionably . . . irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). There is no adequate remedy at law that can address this irreparable harm.

Without an injunction Letitia Clemons and Dejiona Jackson will not be able to obtain health care from the provider of their choice and will have their health care disrupted. The denial of the freedom of choice required by federal law has been deemed to be irreparable harm. *Bay Ridge Diagnostic Laboratory, Inc. v. Dumpson*, 400 F.Supp. 1104, 1108–12 (E.D.N.Y. 1975). Congress clearly intended that this health care be available to women such as Ms. Clemons, and without an injunction this Congressional intent will be thwarted.

In addition to a denial of its constitutional rights, PPIN is also faced with the irreparable harm occasioned by the loss of funding. To the extent that the State refuses to pay the monies, PPIN simply has no damages remedy to recoup its losses and the damage to PPIN occasioned by closing clinics and laying off staff will not be able to be repaired. Moreover, even the loss of opportunity to compete for a contract has been deemed to be irreparable harm. *CRAssociates, Inc. v. United States*, 95 Fed.Cl. 357, 373 (Fed. Cl. 2010). Certainly, the unilateral termination of the contracts here, with the attendant disruption of PPIN's services, is similarly irreparable.

### THE BALANCE OF HARM FAVORS THE PLAINTIFFS

Against the certain and irreparable harm that will be caused to the plaintiffs is the minimal, if any, harm faced by the defendants. The preliminary injunction will merely maintain the status quo and allow matters to proceed as they were prior to the amendment of the statute pending a final resolution of the case. This will not cause the defendants harm.

### THE PUBLIC INTEREST IS NOT DISSERVED BY THE ISSUANCE OF AN INJUNCTION

"Vindication of constitutional freedoms is in the public interest." *See, e.g.*, *McIntire v. Bethel School*, 804 F.Supp. 1415, 1429 (W.D. Okl. 1992). Additionally, the public has an interest in not allowing the State of Indiana to walk away from its contractual and financial obligations. Moreover, given that Congress has determined that distribution of funds through the Social Security Act and the STD Program is necessary and beneficial for the general public, "the public interest will certainly be served by allowing the Plaintiff to continue receiving federal funds to provide these crucial services." *Planned Parenthood of Central Texas v. Sanchez*, 280 F.Supp.2d at 612.

### THE INJUNCTION SHOULD ISSUE WITHOUT BOND

None of the defendants are faced with any monetary injury if a preliminary injunction is issued. Certainly, no monetary issues are raised by enjoining the informed consent language. And enjoining the State of Indiana's termination of its existing contracts will simply require the State to spend money it has already appropriated. The issuance of a preliminary injunction will not impose any monetary injuries. In the absence of such injuries, no bond should be required. *See, e.g.*, *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

### CONCLUSION

For the foregoing reasons, a preliminary injunction should be issued in this case as follows:

    a.    All attempts to stop current or future funding contracted for or due PPIN should be enjoined and defendants ISDH, Director of the Indiana State Budget Agency, Commissioner of the Indiana Department of Administration, and FSSA should be enjoined to take all steps to insure that all monies are paid.

    b.    The informed consent provisions of Indiana Code § 16-34-2-1.1(a)(1)(E) and Indiana Code § 16-34-2-1.1(G) should be enjoined and defendants ISDH and the Marion, Monroe, and Tippecanoe County Prosecutors should be enjoined from taking any actions against plaintiffs for failure to comply with these provisions.

Kenneth J. Falk, Ind. Bar No. 6777-49
Gavin M. Rose
Jan P. Mensz
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
Ph:      317-635-4059
Fax:    317-635-4105
<kfalk@aclu-in.org>

Roger K. Evans[*]
Planned Parenthood Federation of America
434 W. 33rd Street
New York, NY 10001
Ph:      212-541-7800

Talcott Camp*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

*Attorneys for the Plaintiffs*

---

[*] Application for admission *pro hac vice* to be filed.