## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF INDIANA, INC., | ) | |
| MICHAEL KING M.D., CARLA CLEARY C.N.M, | ) | |
| LETITIA CLEMONS, and DEJIONA JACKSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-cv-630-TWP-TAB |
| | ) | |
| COMMISSIONER OF THE INDIANA STATE | ) | |
| DEPARTMENT OF HEALTH, DIRECTOR OF THE | ) | |
| INDIANA STATE BUDGET AGENCY, | ) | |
| COMMISSIONER OF THE INDIANA DEPARTMENT | ) | |
| OF ADMINISTRATION, SECRETARY OF THE | ) | |
| INDIANA FAMILY AND SOCIAL SERVICES | ) | |
| ADMINISTRATION, THE PROSECUTOR OF MARION | ) | |
| COUNTY, THE PROSECUTOR OF MONROE COUNTY, | ) | |
| THE PROSECUTOR OF TIPPECANOE COUNTY, | ) | |
| INDIANA GENERAL ASSEMBLY, and the | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON MOTION FOR PRELIMINARY INJUNCTION

Following a vigorous and often contentious legislative debate, Governor Mitch Daniels signed House Enrolled Act 1210 ("HEA 1210") into law on May 10, 2011. The new law accomplishes two objectives. First, HEA 1210 prohibits certain entities that perform abortions from receiving any state funding for health services unrelated to abortion – including for cervical PAP smears, cancer screenings, sexually transmitted disease testing and notification, and family planning services (the "defunding provision"). This portion of the law – codified at Ind. Code § 5-22-17-5.5(b) through (d) – went into effect immediately. Second, HEA 1210 modifies the informed consent information that abortion providers must give patients prior to receiving

abortion services (the "informed consent provision").  This portion of the law – codified at Ind. Code § 16-34-2-1.1(a)(1) – goes into effect July 1, 2011.

Within minutes of HEA 1210 being signed into law, Plaintiffs – Planned Parenthood of Indiana, Inc. ("PPIN"), Michael King, M.D., Carla Cleary, C.N.M., Letitia Clemons, and Dejiona Jackson, (collectively, "Plaintiffs") – filed a lawsuit against the Commissioner of the Indiana State Department of Health, *et al*. (collectively, "Commissioner"), challenging the legality of both the defunding provision and the informed consent provision.  That same day, this Court heard oral arguments on Plaintiffs' Motion for a Temporary Restraining Order ("TRO"), which related only to the defunding provision.  The next day, on May 11, 2011, the Court denied Plaintiffs' Motion.  In doing so, the Court cited the exacting standard required for a TRO, PPIN's limited evidence supporting immediate and irreparable harm, and the fact that the Commissioner had not yet had the opportunity to brief the relevant issues.

Now, this matter is before the Court on Plaintiffs Motion for Preliminary Injunction (Dkt. 9).  The parties have fully briefed the issues and the Court heard oral arguments on this matter on June 6, 2011.  For the reasons set forth below, Plaintiffs Motion is **GRANTED** in part and **DENIED** in part.

## I. <u>THE DEFUNDING PROVISION</u>

**A.     Background**

The defunding provision of HEA 1210 generally prohibits Indiana agencies from contracting with or making grants to any entities that perform abortion services.  It also immediately canceled past state appropriations to pay for contracts with or grants made to entities that perform abortions.  The defunding provision reads as follows:

(b) An agency of the state may not:

2

(1) enter into a contract with; or
(2) make a grant to;
any entity that performs abortions or maintains or operates a facility where abortions are performed that involves the expenditure of state funds or federal funds administered by the state.

(c) Any appropriations by the state:
(1) in a budget bill;
(2) under IC § 5-19-1-3.5; or
(3) in any other law of the state;
to pay for a contract with or grant made to any entity that performs abortions or maintains or operates a facility where abortions are performed is canceled, and the money appropriated is not available for payment of any contract with or grant made to the entity that performs abortions or maintains or operates a facility where abortions are performed.

(d) For any contract with or grant made to an entity that performs abortions or  maintains or operates a facility where abortions are performed covered under subsection (b), the budget agency shall make a determination that funds are not available, and the contract or the grant shall be terminated under section 5 of this chapter.

Ind. Code § 5-22-17-5.5.  The defunding provision does not apply to hospitals licensed under Ind. Code § 16-21-2 or ambulatory surgical centers licensed under Ind. Code § 16-21-2. Ind. Code § 5-22-17-5.5(a).

PPIN is an Indiana not-for-profit corporation that provides comprehensive reproductive healthcare services throughout Indiana.  With 28 health centers in Indiana, PPIN has provided approximately 76,229 patients with health care services, including cervical smears, cancer screening, sexually transmitted disease (STD) testing, self-examination instructions, and a variety of family planning and birth control options.  Only a small percentage of PPIN's services involve abortion.  For abortion services, PPIN uses funds from private sources and takes steps to ensure no commingling of private and taxpayer dollars.  PPIN is audited annually by an

3

independent auditing firm and routinely by the Indiana Family Health Council.  To date, no audit has uncovered inappropriate commingling.[1]

## B.    PPIN's Enrollment in Medicaid

Significant to this dispute, PPIN is a Medicaid provider.  To that end, PPIN has executed a provider agreement ("Provider Agreement") with the Indiana Family and Social Services Administration ("FSSA"), which administers Indiana's Medicaid program.  Under the Provider Agreement, PPIN provides Medicaid-approved services and is then reimbursed by federal and state funds, paid through FSSA and the Indiana State Budget Agency.  Reimbursable services include, among other things, the diagnosis and treatment of STD's, health education and counseling, pregnancy testing and counseling, the provision of contraceptives, and cervical smears.

In the past year, PPIN provided Medicaid services to more than 9,300 patients throughout Indiana and, in turn, received $1,360,437.00 in funds as a Medicaid provider.  Plaintiffs Letitia Clemons and Dejiona Jackson are two such Medicaid recipients who receive annual examinations and other health services at their local PPIN health centers.  Both wish to continue using PPIN as their provider for various Medicaid-funded services, and PPIN remains a competent provider of these services.

## C.    PPIN's Receipt of Other Federally Funded Grants

PPIN also receives reimbursement for other services from funds originating from federal

---

[1] The Commissioner, however, contends that PPIN's audited financial statements for 2009 and 2010 "give rise to a reasonable inference that it commingles Medicaid reimbursements with other revenues it receives." (Dkt. 28 at 1). In particular, the Commissioner alleges that Medicaid reimbursements "help pay for total operational costs, such as management, personnel, facilities, equipment and other overhead." (Dkt. 28 at 2).

grants and programs that pass through the State of Indiana in various ways.  For instance, PPIN has entered into two contracts with the Indiana State Department of Health.  The contracts, which total $150,000, are for Disease Intervention Services ("DIS") and are designed to ensure that individuals diagnosed with or exposed to STD's are provided notification and testing.  PPIN investigates and intervenes in approximately 3,500 STD infection cases each year.  The funds for the DIS grants are made through the federal Preventative Health Services Block Grant Program, 42 U.S.C. § 247c, *et seq.*, and utilize entirely federal monies.

**D.      The Effect of HEA 1210 on PPIN**

HEA 1210 will exact a devastating financial toll on PPIN and hinder its ability to continue serving patients' general health needs. Despite a large influx of donations following HEA 1210's passage and the Court's ruling denying Plaintiffs' request for a TRO, the law has already affected PPIN in tangible ways.  Specifically, PPIN has ceased performing services under the DIS grant and has stopped taking new Medicaid patients.  As of June 20, 2011, PPIN stopped treating its Medicaid patients and has laid off two of its three STD specialists. PPIN estimates that the new law will force it to close seven health centers and eliminate roughly 37 employees.  According to PPIN, thousands of patients have lost or will lose their healthcare provider of choice.  Additional facts are added below as needed.

## II.  <u>LEGAL STANDARD</u>

A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 389 (7th Cir. 1984) (citation and internal quotations omitted). When a court is presented with a request for preliminary injunction, it considers multiple factors.  As the Seventh Circuit has recognized, a party seeking to obtain a preliminary injunction must demonstrate: (1)

"a likelihood of success on the merits," (2) "a lack of an adequate remedy at law," and (3) "a future irreparable harm if the injunction is not granted." *Reid L. v. Ill. State Bd. of Educ.*, 289 F.3d 1009, 1021 (7th Cir. 2002). The court must then balance, on a sliding scale, the irreparable harm to the moving party with the harm an injunction would cause to the opposing party. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). The greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Id.* Finally, the court must consider the interest of and harm to nonparties that would result from a denial or grant of the injunction. *See Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994).

### III.  DISCUSSION OF DEFUNDING PROVISION

**A.     Likelihood of Success on the Merits**

Plaintiffs make four separate arguments challenging the legality of the defunding provision. First, the law violates the "freedom of choice" provision of the Medicaid statute. Second, along similar lines, the defunding provision is preempted by federal law. Third, the defunding provision violates the Contract Clause of the United States Constitution. Fourth, the defunding provision imposes an "unconstitutional condition" on PPIN's receipt of state and federal funds. Given the nature of its ruling, the Court only needs to address Plaintiffs' arguments relating to "freedom of choice" and preemption. Specifically, the Court finds that Plaintiffs have established: (1) a reasonable likelihood of success on the merits of their "freedom of choice" argument; and (2) a reasonable likelihood of success on their preemption argument as it relates to the DIS grants.

**B.     Does the defunding provision violate federal law relating to Medicaid?**

This dispute can be distilled into a single question: Can the State of Indiana exclude PPIN as a qualified Medicaid provider because PPIN performs abortion services that are unrelated to its Medicaid services?   The Commissioner argues that Indiana is free to exclude PPIN as a Medicaid provider because states have the authority to determine what constitutes a "qualified" provider.   PPIN sharply disagrees, arguing that the defunding provision illegally limits a Medicaid recipient's choice of providers.   Before the Court reaches the merits of this very difficult question, however, some background is instructive.

**1.     Background**

The Medicaid program, jointly funded by the states and federal government, pays for medical services to low-income persons pursuant to state plans approved by the Secretary of the Department of Health and Human Services (hereinafter, "HHS"). *See* 42 U.S.C. § 1396a(a)-(b). As the Supreme Court has noted, Medicaid is a federal-state program that is "designed to advance cooperative federalism." *Wisconsin Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 495 (2002).

State participation in Medicaid is voluntary.   But if a state opts to participate, and thus receive federal assistance, it must conform its Medicaid program to federal law. *See Blanchard v. Forrest*, 71 F.3d 1163, 1166 (5th Cir. 1996).   A state electing to participate in Medicaid must submit a plan detailing how it will expend its funds. *Community Health Center v. Wilson-Coker*, 311 F.3d 132, 134 (2d Cir. 2002); *see also S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 586 (5th Cir. 2004) ("a state must submit to the [federal government] and have approved a 'state plan' for 'medical assistance' . . . that contains a comprehensive statement describing the nature and scope of the state's Medicaid program.") (citations omitted).   From there, the Secretary of HHS

7

reviews each plan to ensure that it complies with a long list of federal statutory and regulatory requirements. *See Wilson-Coker*, 311 F.3d at 134; 42 C.F.R. § 430.15(a). The Secretary of HHS delegates power to review and approve plans to Regional Administrators of the Centers for Medicare and Medicaid Services ("CMS"). *See Wilson-Coker*, 311 F.3d at 134; 42 C.F.R. § 430.15(b).

These restrictions notwithstanding, states do enjoy some autonomy and flexibility in devising Medicaid plans. Specifically, a state may establish "reasonable standards relating to the qualifications of providers…". 42 C.F.R. § 431.51(c)(2). As the Supreme Court has recognized, the Medicaid statute "gives the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in the best interests of recipients." *Alexander v. Choate*, 469 U.S. 287, 303 (1985) (citation and internal quotations omitted). Indiana participates in the Medicaid program and is therefore bound by its requirements. Ind. Code § 12-15-1-1, *et seq.* Indiana's Medicaid program provides virtually all non-experimental, medically necessary healthcare services to low-income Hoosiers.[23]

Central to the present dispute, a state plan must provide that "any individual eligible for medical assistance . . . may obtain such assistance *from any* institution, agency, community pharmacy, or person, *qualified to perform the service or services required . . . who undertakes to provide him such services*…". 42 U.S.C. § 1396a(a)(23) (emphasis added) (hereinafter, "'freedom of choice' provision"). This "freedom of choice" provision has been interpreted by the Supreme Court as giving Medicaid recipients the right to choose among a range of qualified

---

[2] It is worth noting that the federal government reimburses roughly 90% of family planning services provided through the Medicaid program. *See* U.S. DEP'T OF HEALTH & HUMAN SERVS., CTRS. FOR MEDICARE & MEDICAID SERVS., Data Compendium: Findings: Table VIII.1, available at http://www.cms.gov/DataCompendium/14_2010_Data_Compendium.asp#TopofPage (last visited June 22, 2011).

providers, without government interference. *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785 (1980).

As enacted, the defunding provision of HEA 1210 prohibits PPIN from receiving reimbursement from Medicaid for services that would otherwise be reimbursable. Plaintiffs argue that, as a result, Medicaid patients like Letitia Clemons and Dejiona Jackson will be prohibited from obtaining care and treatment through their preferred Medicaid provider, in violation of the "freedom of choice" provision.

**2.      Do Plaintiffs have a right to sue under 42 U.S.C. § 1983?**

As a threshold matter, the Court must determine if Plaintiffs can use 42 U.S.C. § 1983 as a vehicle to pursue their claim that the defunding provision violates the "freedom of choice" provision. Under § 1983, a plaintiff may sue a person who, acting under color of state law, deprived him or her "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. To sue under § 1983, a plaintiff must first allege a violation of a federal statutory or constitutional *right* – not merely a violation of a federal *law*. *See Blessing v. Freestone*, 520 U.S. 329, 340 (1997). Moreover, Plaintiffs bear the burden of showing that the statute at issue was intended to create an enforceable right. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283-84 (2002).

The Supreme Court has emphasized that "it is *rights*, not the broader or vaguer 'benefits' or 'interests' that may be enforced under the authority of [§ 1983]." *Id.* at 283 (emphasis in original). Further, the Supreme Court has "reject[ed] the notion that [its] cases permit *anything short of an unambiguously conferred right* to support a cause of action brought under § 1983." *Id.* (emphasis added). The framework set out in *Blessing* explains how courts should determine whether a statute creates an enforceable right. Specifically, it directs courts to consider whether:

9

> (1) "Congress intended that the provision in question benefit the plaintiff"; (2) the plaintiff has "demonstrated that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) "the statute unambiguously imposes a binding obligation on the States," such that "the provision giving rise to the asserted right is couched in mandatory, rather than precatory terms."

*Ball v. Rodgers*, 492 F.3d 1094, 1104 (9th Cir. 2007) (quoting *Blessing*, 520 U.S. at 340-341). If all three elements are satisfied, a federal right is "presumptively enforceable by § 1983, subject only to a showing by the state that Congress specifically foreclosed a remedy under § 1983." *Id.* at 1116 (citation and internal quotations omitted).

The Commissioner argues that the Medicaid statutes relied upon by Plaintiffs do not unambiguously confer federal *rights*. Instead, they merely impose legal obligations on the Secretary of HHS to determine if a state is substantially complying with its Medicaid plans, and to withhold federal funds if it is not. *See* 42 U.S.C. § 1396c. According to Defendants, it is the province of the Secretary of HHS – not a federal court – to ascertain if a state's program complies with Medicaid. Thus, the remedy for a state's non-compliance with the Medicaid statutes is the federal government's termination of funding, meaning a private right of action is an inappropriate enforcement mechanism. Stated differently, because the applicable statutes only describe the mechanics and criteria for federal reimbursement under Medicaid, they do not provide a source of substantive rights for Plaintiffs.

The Court respectfully disagrees, and finds that a private right of action exists under § 1983 in order to enforce the "freedom of choice" provision. Tracking the *Blessing* framework, the Court first turns to the language of the "freedom of choice" provision, which provides in relevant part:

> A state plan for medical assistance <u>must…provide</u> that (A) <u>any individual eligible</u> for medical assistance (including drugs) may obtain such assistance from <u>any institution</u>, agency, community pharmacy, or person, <u>qualified to perform the service or services required</u> (including an organization which provides such services, or arranges for their availability, on a prepayment basis), <u>who undertakes to provide him such services</u> …

42 U.S.C. § 1396a(a)(23) (emphasis added).

As to the first *Blessing* prong, the plain language of the "freedom of choice" provision evinces a clear intent to benefit *individuals* by providing them with a choice in their Medicaid provider. This is the sort of "individual-focused terminology" that "unambiguously confer[s]" an individual right under the law. *Gonzaga*, 536 U.S. at 283, 287. Almost uniformly, other federal courts have agreed with this interpretation. *See, e.g.*, *Harris v. Olszewski*, 442 F.3d 456, 459 (6th Cir. 2006) (§ 1396a(a)(23) confers a right enforceable by § 1983); *G. ex. rel. K v. Hawaii Dept. of Human Servs.*, 2009 WL 1322354, at *12 (D. Hawaii May 11, 2009) (same); *Women's Hosp. Foundation v. Townsend*, 2008 WL 2743284, at *8 (M.D. La. July 10, 2008) (same); *Martin v. Taft*, 222 F. Supp. 2d 940, 979 (S.D. Ohio 2002) (same).

The Court would be remiss not to mention that at least one other federal court has disagreed with this analysis. *See M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1307 (D. Utah 2003) ("the freedom of choice provisions do not contain the unambiguous language rights-creating language of *Gonzaga*"). That said, the Court believes that the robust analysis found in *Harris* is sound and persuasive. Accordingly, Plaintiffs have satisfied the first *Blessing* prong.

With respect to the second *Blessing* prong, the Court finds that the right is not so "vague and amorphous" that it would strain judicial competence. To the contrary, "while there may be legitimate debates about the medical care covered by or exempted from the freedom-of-choice provision, the mandate itself does not contain the kind of vagueness that would push the limits of judicial enforcement." *Harris*, 442 F.3d at 462.

As to the third prong, by using the language "must…provide," the right is framed in mandatory, rather than advisory, terms. *Id*. Finally, there is no indication that Congress sought to foreclose this remedy. As the *Harris* court noted, the other provisions of the Medicaid Act do not "explicitly or implicitly foreclose the private enforcement of [the 'freedom of choice' provision] through § 1983 actions." *Id*.[3] In short, as *Harris* recognized, "[t]hat the Federal Government may withhold federal funds to non-complying States is not inconsistent with private enforcement." *Id*. at 463.

### 3. Merits

Having determined that a right to sue exists under § 1983, the Court must now turn to the merits of Plaintiffs' contention that HEA 1210 violates the "freedom of choice" provision. Unquestionably, states have authority to exclude medical providers from participating in Medicaid under some circumstances. The question then becomes whether this is one of those circumstances.

The Court begins its analysis with the Supreme Court's decision in *O'Bannon*, cited above, which recognized that the "freedom of choice" provision "confers an absolute right to be free from government interference with the choice to [receive services from a provider] that continues to be qualified." 447 U.S. at 785. However, this right is not limitless. It applies only to the extent that the provider "continues to be qualified," as the Medicaid Act "clearly does not confer a right on a recipient to enter an unqualified [provider] and demand a hearing to certify it,

---

[3] The Seventh Circuit has not directly addressed this issue but has previously assumed, without deciding, that a private right of action existed under 42 U.S.C. § 1396a(a)(8), which provides that: "A state plan for medical assistance must … provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals…". *Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 457-58 (7th Cir. 2007).

nor does it confer a right on a recipient to continue to receive benefits for care [from a provider] that has been decertified." *Id*.

Applying these principles, *O'Bannon* held that Medicaid-eligible nursing home patients did not have a vested right to choose a nursing home that was being decertified as a healthcare provider due to the home's failure to comply with certain health and safety requirements. In a similar vein, the Seventh Circuit has recognized that the "freedom of choice" provision is meant "to give the recipient a choice among available facilities, not to require the creation or authorization of new facilities." *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 911 (7th Cir. 2003). Thus, it is well-settled that the "freedom of choice" provision does not give Medicaid recipients an absolutely unfettered right to choose their healthcare provider. For instance, a Medicaid recipient certainly does not have a right to receive services from an incompetent provider with inadequate services.

The defunding provision, however, renders PPIN "unqualified" to serve as a Medicaid provider because, separate and apart from its basic health care services, PPIN also performs abortions. Thus, the question arises: Can Indiana pick and choose Medicaid providers based on the range of medical services they provide?

### a. Commissioner's arguments

The Commissioner argues that the answer is "Yes" – and its position is backed by some notable authority. Significantly, the Medicaid Act itself provides that "*in addition to any other authority*, a State may exclude any individual or entity [from participating in its Medicaid program] for any reason for which the Secretary [of HHS] could exclude the individual or entity from participation [in Medicaid]." 42 U.S.C. § 1396a(p)(1) (emphasis added). Thus, in addition to excluding an entity for the same reasons as the Secretary of HHS, a state may also exclude an

entity from participating under "any other authority." *First Medical Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46, 53 (1st Cir. 2007).

To flesh out what this means, *Vega-Ramos* – a case that did not involve the "freedom of choice" provision – reviewed the legislative history of § 1396a(p)(1), ultimately holding that the "any other authority" language means that a state is permitted "to exclude an entity from its Medicaid program for *any* reason established by state law." *Id.* (emphasis in original); *see also* 42 C.F.R. §1002.2(b).  According to the Commissioner, nothing supports the view that a state's decision to disqualify a single Medicaid provider amounts to a violation of a Medicaid recipient's "freedom of choice." *See id.*; *see also Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 178 (2d Cir. 1991)  (New York had the right to unilaterally end a contract with Medicaid provider without cause and provider's patients had no constitutionally protected property or liberty interest in choosing that provider).[4]

The Commissioner's arguments are well-taken.  That said, the Court also recognizes that the Commissioner may be reading the legislative history relied upon in *Vega-Ramos* too expansively.  After all, the introductory paragraph of the operative Senate Report states that "[t]he basic purpose of the Committee bill is to improve the ability of the Secretary … to protect … Medicaid … programs from *fraud and abuse*, and to protect the beneficiaries of those programs from *incompetent practitioners and from inappropriate or inadequate care*." S. Rep. 100-109, at 1-2 (1987) (emphasis added).  This history clarifies that the overarching purpose of the statutory subsection generally relates to the provider's quality of services – not its scope of

---

[4] It is worth noting that the Seventh Circuit cited *Kelly Kare* in its *Bruggeman* decision.  However, the citation was only used to support the non-controversial proposition that the aim of the "freedom of choice" provision is "to give the recipient a choice among available facilities, not to require the creation or authorization of new facilities." *Bruggeman*, 324 F.3d at 911.  The *Bruggeman* decision did not delve into whether or not a state can exclude an entity from Medicaid for *any* reason.

services.  On this point, there are no allegations that PPIN is incompetent or that it provides inappropriate or inadequate care.  PPIN is, by all accounts, "qualified" as the word is used in common vernacular.  The overall legislative history casts, at the very least, some doubt on the Commissioner's contention that it had virtually unfettered discretion to disqualify otherwise competent Medicaid providers.

Moreover, it is important to remain mindful that this case is presently before the Court on a preliminary injunction request, meaning the Court is not tasked with determining who will ultimately prevail.  Instead, the Court's inquiry is limited to whether PPIN has a "reasonable likelihood of success on the merits." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (citation and internal quotations omitted).  Thus, while it remains to be seen who will ultimately prevail on the merits, the Court is persuaded that PPIN has met its burden of establishing a reasonable likelihood of success.  Three considerations support this conclusion: (1) the federal government's recent rejection of Indiana's proposed amendment to its Medicaid plan; (2) the language of various provisions in the Medicaid statutes; and (3) case law.

### b.   HHS' recent decision

Recently, HHS, the federal department overseeing the administration of the Medicaid program, denied Indiana's proposed amendment to its Medicaid plan incorporating the defunding provision.  By doing so, HHS effectively rejected Indiana's interpretation of the "freedom of choice" provision.

As an initial matter, a review of the administrative enforcement mechanisms found in Medicaid law is instructive.  A state participating in Medicaid must file a plan amendment with CMS whenever it enacts a "[m]aterial change [] in State law, organization, or policy" respecting Medicaid. 42 C.F.R. § 430.12(c)(1)(ii).  HHS, through CMS, reviews the plan and determines

whether it complies with statutory and regulatory requirements. *See* 42 U.S.C. § 1316(a)(1) and (b).  HHS' disapproval of a plan is final absent further action by the state if its proposed amendment is denied.  Under the Medicaid statute, a state can seek reconsideration within 60 days of an adverse ruling. 42 U.S.C. § 1316(a)(2).  When this occurs, the Secretary of HHS is required to hold a hearing and shall then "affirm, modify, or reverse" the prior decision. *Id*.  This decision constitutes a "final agency action" because it is the "final decision of the Secretary [of HHS]." 42 C.F.R. § 430.102(c).  If the state remains dissatisfied with the Secretary's determination, the state may seek judicial review. 42 U.S.C. § 1316(a)(5).

If the state does not act in compliance with an approved plan, or if an approved plan no longer complies with the requirements of the Medicaid Act, the Secretary of HHS may initiate a compliance action. *See* 42 U.S.C. § 1396c; 42 C.F.R. § 430.35.  When this occurs, the Secretary of HHS notifies the state that "no further payments will be made to the State (or that payments will be made only for those portions or aspects of the program that are not affected by the noncompliance)" and that "the total or partial withholding will continue until the Administrator is satisfied that the State's plan and practice are, and will continue to be, in compliance with Federal requirements." 42 C.F.R. § 430.35(d)(1)(i)-(ii). Funding may resume only when the "Secretary is satisfied that there will no longer be [a] failure to comply" with the requirements imposed by the Medicaid Act. 42 U.S.C. § 1396c.

With that backdrop in mind, the Court turns to recent administrative events involving this case.  On May 13, 2011, FSSA submitted a Medicaid plan amendment to account for the defunding provision – to "make changes to Indiana's State Plan in order to conform to Indiana State Law."  On June 1, 2011, CMS Administrator, Donald M. Berwick, M.D., responded by

informing FSSA that he was "unable to approve" the defunding provision amendment.   In

relevant part, Berwick wrote:

> Section 1902(a)(23)(A) of the [Medicaid] Act provides that beneficiaries may
> obtain covered services from any qualified provider that undertakes to provide
> such services. This [amendment] would eliminate the ability of Medicaid
> beneficiaries to receive services from specific providers for reasons not related to
> their qualifications to provide such services. As you know, federal Medicaid
> funding of abortion services is not permitted under federal law except in
> extraordinary circumstances. At the same time, Medicaid programs may not
> exclude qualified health care providers from providing services that are funded
> under the program because of a provider's scope of practice. Such a restriction
> would have a particular effect on beneficiaries' ability to access family planning
> providers, who are subject to additional protections under section 1902(a)(23)(B)
> of the Act…. Therefore, we cannot determine that the proposed amendment
> complies with section 1902(a)(23) of the Act.

(Emphasis added; internal parenthetical omitted).   CMS also staked out this position in an

informational bulletin published on June 1, 2011.[5] *See* (Dkt. 48-4 at 1-2) ("States are not …

permitted to exclude providers from the [Medicaid] program solely on the basis of the range of

medical services they provide … Medicaid programs may not exclude qualified health care

providers … from providing services under the program because they separately provide

abortion services as part of their scope of practice.") (internal parenthetical omitted).[6]

HHS' recent decision generates significant questions that potentially bear on the outcome

of the present motion: Namely, at this stage, is HHS' position entitled to any deference? And, if

so, how much?   After all, it is well-settled that, under certain circumstances, "considerable

weight" should be given to an executive department's construction of a statutory scheme that it is

entrusted to administer.   *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467

U.S. 837, 844-45 (1984).

---

[5] Because HHS acts through CMS, the Court, at times, uses the two entities interchangeably.

[6] On June 23, 2011 the Defendants filed a formal request for reconsideration with CMS (Dkt. 74-1).

Even so, the Commissioner argues that HHS' interpretation should be accorded no deference whatsoever. To support this position, the Commissioner highlights that the CMS letter was not a final, authoritative agency action. Instead, the letter was merely the first step in a fluid administrative process. Indeed, HHS could still reverse course, as its position is still subject to additional administrative review. The Commissioner further argues that *Chevron* deference only applies when "Congress has explicitly left a gap for the agency to fill," meaning "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id.* at 843-44. According to the Commissioner, Congress has left no such gap. Finally, setting aside *Chevron*, an agency interpretation can still have persuasive authority, depending "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). However, CMS' letter lacks persuasive authority, the Commissioner argues, because it is essentially devoid of reasoning and did not address Section 1396a(p)(1), described above, head-on.

The Court respectfully disagrees with the Commissioner's argument. Even if the CMS letter is not entitled to full *Chevron*-style deference, some measure of deference is warranted. And, given the procedural posture of this case, the Court sees no reason to spell out this measure of deference with categorical exactitude. To reiterate, the current motion before the Court is one for a preliminary injunction, where Plaintiffs only must show a "reasonable likelihood of success on the merits." With this somewhat amorphous standard in mind, the Court believes that it would be more academic than pragmatic to assign a precise measure of the appropriate level of deference.

18

More importantly, ascribing deference to the CMS letter is, in the Court's view, squarely in line with a thorough body of case law.  Here, the refusal to approve the proposed amendment to Indiana's Medicaid plan is tantamount to a denial, even though additional mechanisms for reevaluation are still available.  Courts have routinely "applied *Chevron* deference to HHS' approval *or denial* of state Medicaid plans." *Harris*, 442 F.3d at 470 (emphasis added) (citing *Rosen v. Goetz*, 410 F.3d 919, 927 (6th Cir. 2005); *PhRMA v. Thompson*, 362 F.3d 817, 821 (D.C. Cir. 2004); *S.D. v. Hood*, 391 F.3d 581, 596 (5th Cir. 2004); *Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 939 (9th Cir. 2005); *Georgia, Dep't of Med. Assistance ex rel. Toal v. Shalala*, 8 F.3d 1565, 1572-73 (11th Cir.1993)); *see also West Virginia v. Thompson*, 475 F.3d 204, 212-13 (4th Cir. 2007) ("Courts, therefore, have rightly granted *Chevron* deference to agency interpretations of statutes in the context of *state plan amendment disapprovals*.") (emphasis added).  Moreover, as the Second Circuit has noted, "even relatively informal [CMS] interpretations, such as letters from regional administrators, 'warrant[ ] respectful consideration' due to the complexity of the statute and the considerable expertise of the administering agency." *Wilson-Coker*, 311 F.3d at 138 (quoting *Blumer*, 534 U.S. at 479).  As the Seventh Circuit has noted, "the absence of notice-and-comment procedures is not dispositive to the finding of *Chevron* deference." *Beard v. C.I.R.*, 633 F.3d 616, 623 (7th Cir. 2011) (citation omitted).

In reaching these decisions, courts have emphasized that Congress expressly gave the Secretary of HHS "authority to review and approve Medicaid plans as a condition to disbursing federal Medicaid payments." *PhRMA*, 362 F.3d at 822 (citation omitted).  "In carrying out this duty, the Secretary [of HHS] is charged with ensuring that each state plan complies with a vast network of specific statutory requirements." *Id*.  "Through this express delegation of specific

interpretive authority … the Congress manifested its intent that the Secretary's determinations, based on interpretation of the relevant statutory provisions, *should have the force of law*." *Id.* (emphasis added; citations and internal quotations omitted).  Plainly stated, the Court finds that this is precisely the type of congressional authorization needed to invoke *Chevron* deference.

From a practical standpoint, ascribing some deference to HHS' determination makes sense. HHS has singular competence in administering the Medicaid program and is thus well-suited to interpret the technical intricacies of Medicaid law.  As the Second Circuit colorfully noted, "We take care not lightly to disrupt the informed judgments of those who must labor daily in the minefield of often arcane policy, especially given the substantive complexities of the Medicaid statute." *Wilson-Coker*, 311 F.3d at 138; *see also West Virginia*, 475 F.3d at 212 ("The Medicaid statute is a prototypical 'complex and highly technical regulatory program' benefitting from expert administration, which makes deference particularly warranted.") (citations and internal quotations omitted).  Tracking this general reasoning, the Court finds that HHS' determination must be entitled to some deference, in light of the expertise and institutional knowledge required to administer a complex program governed by a labyrinth of complex laws.

The Commissioner likens HHS' interpretation to a mere non-binding opinion letter, which would not be entitled to *Chevron* deference. *See U.S. v. Mead Corp.*, 533 U.S. 218, 234 (2001) ("interpretations contained in policy statements, agency manuals, and enforcement guidelines … [are] beyond the *Chevron* pale.") (citation and internal quotations omitted).  The Court, however, is not persuaded. Even though CMS' letter was only the opening salvo in a potentially longer battle, it is still *binding* in the sense that it remains the position of the federal government. As it stands, the federal government has refused to approve the proposed amendment to Indiana's Medicaid plan, meaning the proposed amendment remains denied. *See*

20

42 U.S.C. 1316(c) ("Action pursuant to an initial determination of the Secretary described in subsection (a) shall not be stayed pending reconsideration.").  And if Indiana does not seek reconsideration – of course, this is an unlikely scenario – the initial decision carries the force of law.  The Court believes that Commissioner's position ignores the context of the CMS letter. Significantly, the letter was written by the head of CMS after consulting with the Secretary of HHS. 42 C.F.R. § 430.15(c)(2) (*denial* of a plan amendment requires consultation with the Secretary of HHS).  In short, CMS' letter is different than a mere "opinion letter."

The Court acknowledges that further administrative review is available and that this is a potentially evolving process. *See* 42 C.F.R. § 430.18.  While this fact perhaps reduces the deference owed HHS' decision, it does not extinguish it altogether, particularly given the early procedural posture of this case.  To use a sports metaphor, just because the final buzzer has not yet sounded does not mean the Court must avert its eyes from the scoreboard.  For the reasons explained above, *some* level of deference is warranted. *See Estate of Landers v. Leavitt*, 545 F.3d 98, 107 (2d Cir. 2008) ("in cases such as those involving Medicare or Medicaid, in which CMS, a highly expert agency, administers a large complex regulatory scheme in cooperation with many other institutional actors, the various possible standards for deference – namely, *Chevron* and *Skidmore* begin to converge.") (citation and internal quotations omitted).

### c.    Other considerations

The Court finds HHS' interpretation to be a reasonable reading of a somewhat unclear statute. *See Chevron*, 467 U.S. at 843 (court should determine if Secretary's interpretation is a permissible and reasonable construction of the statute); *Dep't of the Treasury v. Fed. Labor Relations Auth.*, 494 U.S. 922, 928 (1990) (agency's view was unreasonable because it was "flatly contradicted" by plain language of the statute).  Thus, even stripping HHS' decision from

the equation, PPIN would still likely have a reasonable chance of prevailing, as the Medicaid statute itself supports the view that states do not have carte blanche to expel otherwise competent Medicaid providers.  In the Court's view, two specific considerations support this position: (1) the actual language of the "freedom of choice" provision; and (2) the fact that the Commissioner's interpretation would render other provisions of the Medicaid Act redundant or meaningless.

First, the actual language of the "freedom of choice" provision supports the view that the defunding provision unlawfully narrows Medicaid recipients' choice of qualified providers.  To reiterate, the "freedom of choice" provision provides that "any individual eligible for medical assistance … may obtain such assistance *from any* institution, agency, community pharmacy, or person, *qualified to perform the service or services required … who undertakes to provide him such services*." 42 U.S.C. § 1396a(a)(23) (emphasis added). Further, the regulations clarify that "recipients may obtain services from *any qualified Medicaid provider that undertakes to provide the services to them*." 42 C.F.R. § 431.51(a)(1) (emphasis added).  If the Commissioner's interpretation were adopted, it would undoubtedly restrict the rights of Medicaid patients to obtain services from "any qualified Medicaid provider."  This would arguably rob the "freedom of choice" provision of any real meaning.  In sum, a strong argument exists that Plaintiffs' interpretation is superior in terms of giving effect to every word of the "freedom of choice" provision. *See Moskal v. U.S.*, 498 U.S. 103, 109 (1990) ("a court should give effect, if possible, to every clause and word of a statute.") (citations and internal quotations omitted).

This overall position is backed by at least two analogous district court cases.  In *Chisholm v. Hood*, 110 F. Supp. 2d 499 (E.D. La. 2000), a state Medicaid agency sought to require certain Medicaid-eligible disabled children to obtain occupational, speech, and audiological services

provided by their resident school boards.  The district court held that this requirement violated a patient's freedom of choice, recognizing that "[s]tates must allow *all* qualified providers to participate in Medicaid" and "[r]estricting Medicaid recipients to schools and EICs for therapy services that are traditionally included in their educational or family service plans violates their statutory right to obtain these services from other qualified providers." *Id*. at 506.

Similarly, in *Bay Ridge Diagnostic Lab., Inc. v. Dumpson*, 400 F. Supp. 1104 (E.D.N.Y. 1975), the district court granted a preliminary injunction against a New York City program due in part to restrictions in medical services created by the program's limiting of laboratory services to those which had a contract with the state. *Id*. at 1108.  In doing so, the district court reviewed the legislative history applicable to the "freedom of choice" provision, recognizing that the provision was meant "to assure freedom of choice as to all qualified providers of medical services willing to render services in accordance with the fee schedules established by the state." *Id*. at 1107-08.[7]  At bottom, the language of the "freedom of choice" provision suggests that PPIN – an otherwise competent Medicaid provider – cannot be rendered "unqualified" solely because Indiana unilaterally says so.

Second, if the Commissioner's interpretation was adopted, certain provisions of the Medicaid Act would arguably be rendered redundant or meaningless.  Most notably, §1396a(p)(1), which the Commissioner relies on to support the view that it can exclude PPIN as a Medicaid provider, states, "in addition to any other authority, a State may exclude any individual or entity [from participating in its Medicaid program] for any reason for which the

---

[7] The Commissioner counters that these cases are inapposite because they involve instances in which the state *forced* a beneficiary "to utilize the services of one provider over another provider *within* the universe of accepted providers." (Dkt. 28 At 12) (emphasis in original).  This point is cogent and has some appeal. Nonetheless, the Court still believes that these cases bolster PPIN's argument that they have a reasonable likelihood of success on the merits.

Secretary [of the Department of HHS] could exclude the individual or entity from participation [in Medicaid]." 42 U.S.C. § 1396a(p)(1).  If a state could exclude a provider for any reason at all, the latter half of this provision – relating to the HHS' authority – would be entirely superfluous.  For the above reasons, the Court finds that Plaintiffs have a reasonable likelihood of succeeding on the merits of their "freedom of choice" argument.

## C.    The DIS Grants

As mentioned earlier, the defunding provision affects more than just Medicaid dollars – DIS funding has also been cut.  To reiterate, PPIN has entered into two DIS grant agreements with the Indiana State Department of Health for $150,000.00.  These grants are designed to ensure that individuals diagnosed with or exposed to STDs are tracked down and promptly tested.  These grants allow PPIN to investigate and intervene in approximately 3,500 STD infection cases each year.  Further, PPIN is the only entity that provides such DIS services in 22 Indiana counties.  The DIS grants come from the federal government, which makes grants to states and other entities for STD screening and treatment activities, referrals for necessary medical services, and studies or demonstrations to evaluate or test STD prevention and control strategies and activities through the Preventive Health Services Block Grant Program. 42 U.S.C.§ 247c(c).

With this background in mind, the question arises: Medicaid issues aside, is the defunding provision unlawful as applied to the DIS grants?  It is somewhat unclear if the Court must address this issue.  Assuming for the moment that the defunding provision is invalid with respect to Medicaid dollars, that fact may be enough to render it invalid as a whole.  The Seventh Circuit has recognized, "[w]hether invalid provisions in a state law can be severed from the whole to preserve the rest is a question of state law." *Burlington Northern & Santa Fe Ry. Co. v.*

*Doyle*, 186 F.3d 790, 804 (7th Cir. 1999) (citations omitted).  Indiana has adopted the following

test for severability:

> A statute bad in part is not necessarily void in its entirety.  Provisions within the
> legislative power may stand if separable from the bad.  But a provision, inherently
> unobjectionable, cannot be deemed separable unless it appears both that, standing
> alone, legal effect can be given to it and that the legislature intended the provision
> to stand, in case others included in the act and held bad should fall.

*State v. Barker*, 809 N.E.2d 312, 317 (Ind. 2004) (quoting *Dorchy v. Kansas*, 264 U.S. 286, 289-

90 (1924)).  More concisely, "[t]he key question is whether the legislature would have passed the

statute had it been presented without the invalid features." *Id.* (citation and internal quotations

omitted).  Here, the Court has no real indication, one way or the other, whether the Indiana

legislature would have passed a defunding provision that only applied to the DIS grants.

Although, in the Court's view, common sense suggests that Medicaid dollars were probably the

legislature's primary consideration.  Moreover, the Commissioner has not expressly argued that

even if an injunction is granted with respect to Medicaid dollars, then an injunction should not be

granted with respect to DIS dollars.  This suggests something of a tacit admission that the

Commissioner views this motion for injunctive relief as an "all or nothing" proposition.

Regardless, this point is academic, given that the Court also finds that Plaintiffs'

preemption argument involving DIS funds has a reasonable likelihood of success.  "A

fundamental principle of the Constitution is that Congress has the power to preempt state law."

*Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citations omitted).  A

preemption analysis requires an examination of congressional intent, and federal regulations

have no less preemptive effect than federal statutes.  *Fidelity Federal Savings & Loan Ass'n v. de

la Cuesta*, 458 U.S. 141, 152-53 (1982).  A state statute may be preempted in three ways: (1) "by

express language in a congressional enactment," (2) "by implication from the depth and breadth

of a congressional scheme that occupies the legislative field," or (3) "by implication because of a conflict with a congressional enactment." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (citations omitted).  The latter arises when compliance with both federal and state regulations is physically impossible or when state law impedes "the accomplishment and execution of the full purposes and objectives of Congress." *Pac Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983) (citation and internal quotations omitted).  Plaintiffs contend that this type of preemption is present under the circumstances. That is, the defunding provision is preempted by 42 U.S.C. § 247c, which involves allowable uses for certain STD funds.

As a threshold question, the Court must examine whether Plaintiffs have a right to enforce this provision.  It is well-settled that "the Supremacy Clause, of its own force, does not create rights enforceable under § 1983." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989) (internal citations omitted).  Moreover, unlike the "freedom of choice" provision, 42 U.S.C. § 247c does not "unambiguously confer[]" an individual right under the law, which would allow a cause of action under Section 1983. *Gonzaga*, 536 U.S. at 283, 287. To further bolster its contention that no private right of action exists, the Commissioner points out that its research revealed "no Seventh Circuit cases holding that there is a freestanding right of action to enforce federal Spending Clause statutes against States under a theory of preemption." (Dkt. 28 at 8-9).  And, as it happens, the United States Supreme Court is set to tackle this issue in its October 2011 term.  In *Maxwell-Jolly v. Independent Living Center of Southern California, Inc.*, 131 S. Ct. 992 (2011) (granting certiorari), the central issue is whether Medicaid recipients and providers may maintain a cause of action under the Supremacy Clause to enforce a provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A), by simply asserting

that the provision preempts a state law.  Petition for Writ of *Certiorari* at ii, *Maxwell-Jolly*, 2010 WL 599171 (Feb. 16, 2010) (No. 09-958).

The Court is not persuaded, as the Commissioner's argument appears to run contrary to a body of cases involving freestanding claims brought under the Supremacy Clause.  For instance, the Supreme Court has reached the merits of a preemption claim concerning a statute enacted pursuant to Congress's spending clause authority. *See PhRMA v. Walsh*, 538 U.S. 644 (2003) (plurality opinion) (involving Medicaid Act).  Although *PhRMA* was a plurality decision, "seven Justices assumed both that the federal courts have jurisdiction and that a claim was stated for spending clause preemption."  *Planned Parenthood of House & Sec. Tex. v. Sanchez*, 403 F.3d 324, 331-32 (5th Cir. 2005) (recognizing that Supreme Court implicitly rejected the contention "that asserting the preemptive force of federal Spending Clause legislation is itself no claim"); *see also Thompson*, 362 F.3d at 819 n.3 (D.C. Cir. 2004) ("By addressing the merits of the parties' arguments without mention of any jurisdictional flaw, the remaining seven Justices appear to have *sub silentio* found no flaw.").  By the Commissioner's own admission, "the Seventh Circuit has indicated that in some circumstances an independent cause of action is not necessary to assert federal preemption against state regulation." (Dkt. 28 at 8) (citing *Illinois Association of Mortgage Brokers v. Office of Banks & Real Estate*, 308 F.3d 762, 765 (7th Cir. 2002)).

While the Supreme Court may indeed reverse course in its upcoming term, inferential leaps – speculation about why the Supreme Court took a case and how it will ultimately rule – are not enough to overcome Plaintiffs' authority, particularly in light of this case's procedural posture.  Thus, the Court believes it must address the merits of Plaintiffs' preemption claim relating to the DIS funds.

Simply stated, the Court believes that Plaintiffs have a reasonable likelihood of success on the merits of this argument.  The Commissioner's overarching contention is that 42 U.S.C. §247c does not restrict how states may regulate recipients of funding.  Plaintiffs, however, have cited to a body of authority indicating that "when federal law imposes a comprehensive mechanism for funding certain programs, participating states may not add their own eligibility requirements for the receipt of federal monies." (Dkt. 48 at 7 n.7). *See, e.g., Valley Family Planning v. North Dakota*, 661 F.2d 99, 100-01 (8th Cir. 1981) (state statute prohibiting federal monies from flowing to an entity that "performs abortions or encourages its clients to obtain abortions" preempted by Title X); *Planned Parenthood of Billings, Inc. v. State of Montana*, 648 F. Supp. 47 (D. Mont. 1986) (state statute prohibiting the federal funds from being disbursed to entities that perform abortions was preempted by Title X); *Planned Parenthood Fed. of Am. v. Heckler*, 712 F.2d 650, 663 (D.C. Cir. 1983) ("Title X does not provide, or suggest that states are permitted to determine eligibility criteria for participants in Title X programs."); *Planned Parenthood of Central Texas v. Sanchez*, 403 F.3d 324, 336-37 (5th Cir. 2005) ("a state eligibility standard that altogether excludes entities that might otherwise be eligible for federal funds is invalid under the Supremacy Clause.").

The Commissioner emphasizes that these cases relate to Title X, which contains specific text addressing who exactly is eligible for Title X grants.  Nonetheless, the Court believes that the basic principle espoused in those cases still holds true in the context of  42 U.S.C. § 247c. The statute does not suggest that states are permitted to determine eligibility criteria for the DIS grants.  To the contrary, the operative regulations clarify that upon awarding the funds, the federal government may "impose additional conditions, including conditions governing the use of information or consent forms, when, in the [federal government's] judgment, they are

necessary to advance the approved program, the interest of public health, or the conservation of grant funds." 42 C.F.R. § 51b.106(e).  For these reasons, the Court finds that Plaintiffs have established a reasonable likelihood of success on the merits of their preemption argument relating to DIS funds.

## D.    Irreparable Harm

In order to prevail on a motion for a preliminary injunction, Plaintiffs must establish that the denial of an injunction will result in irreparable harm.  "'Irreparable' in the injunction context means not rectifiable by the entry of a final judgment." *Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273, 275 (7th Cir. 1992) (citations omitted).  Simply stated, Plaintiffs have satisfied this burden.

HEA 1210 has already affected PPIN in tangible ways.  Specifically, PPIN has ceased performing services under the DIS grant and is unable to take new Medicaid patients.  Moreover, absent an injunction, Plaintiffs Letitia Clemons and Dejiona Jackson will not be able to receive certain medical services from their Medicaid providers of choice.  The denial of freedom of choice has been deemed to be irreparable harm. *Bay Ridge*, 400 F. Supp. At 1108-12.

Also, as discussed above, HEA 1210 has and will continue to dramatically affect PPIN's operations.  PPIN estimates that the new law will force it to close seven health centers and eliminate roughly 37 positions. *See Canterbury Career School, Inc. v. Riley*, 833 F. Supp. 1097, 1105 (D.N.J. 1993) ("Where the result of denying injunctive relief would be the destruction of an ongoing business, such a result generally constitutes irreparable injury.").  More importantly, PPIN's Medicaid services ceased on June 20, 2011.  According to PPIN, thousands of patients have lost or will lose their healthcare provider of choice.

It is true that, as the Commissioner emphasized at oral arguments, PPIN has been the recent recipient of an upsurge in donations from locations spanning the country, even the globe. This newfound influx of cash has allowed PPIN to service existing Medicaid patients and sustain most of its basic operations.   Undoubtedly, though, these donations were something of an aberration, presumably fueled by the prominence of HEA 1210 in the news cycle.   Common sense suggests that as headlines fade, passions will cool and donations will level off.   Thus, with the passage of time, PPIN will be forced to confront the dire financial effects of HEA 1210 head-on.   These circumstances warrant granting a preliminary injunction.

### E.    Balance of Harms and the Public Interest

Where, as here, the party opposing the motion for a preliminary injunction is a political branch of government, "the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance." *Illinois Bell Telephone Co. v. Worldcom Technologies, Inc.*, 157 F.3d 500, 503 (7th Cir. 1998).   Highlighting this principle, the Commissioner emphasizes that the defunding provision promotes the public interest by preventing taxpayer dollars from indirectly funding abortions.

As an initial matter, the Commissioner's argument ignores the fact that PPIN complies with all state and federal requirements to ensure that taxpayer dollars are not used for abortion services.   For the reasons described above in the irreparable harm section, the Court finds that the balance of harms tilts in Plaintiffs' favor.

Further, in light of recent events, the public interest also tilts in favor of granting an injunction.   The federal government has threatened partial or total withholding of federal Medicaid dollars to the State of Indiana, which could total well over $5 billion dollars annually and affect nearly 1 million Hoosiers.   Thus, denying the injunction could pit the federal

government against the State of Indiana in a high-stakes political impasse.  And if dogma trumps pragmatism and neither side budges, Indiana's most vulnerable citizens could end up paying the price as the collateral damage of a partisan battle.  With this backdrop in mind, along with the reasons discussed above, the Court believes the most prudent course of action is to enjoin the defunding provision while the judicial process runs its course.

## IV. <u>INFORMED CONSENT PROVISION</u>

### A.  Background

In addition to the defunding provision, PPIN challenges two sections of the informed consent provision of HEA 1210. Ind. Code § 16-34-2-1.1(a)(1)(E) and (G), which amend the existing law relating to abortion informed consent requirements and are scheduled to go into effect on July 1, 2011. Plaintiffs contend that these two sections constitute impermissible compelled speech.

Specifically, the contested sections require that certain medical practitioners[8] involved in abortions services ("Practitioners") inform women seeking abortions that "objective scientific information shows that a fetus can feel pain at or before twenty weeks of postfertilization age" and that "human physical life begins when a human ovum is fertilized by a human sperm." In relevant part, the challenged portions of the new informed consent provisions read as follows:

> (a) An abortion shall not be performed except with the voluntary and informed consent of the pregnant woman upon whom the abortion is to be performed. Except in the case of a medical emergency, consent to an abortion is voluntary and informed only if the following conditions are met:
>
> (1) At least eighteen (18) hours before the abortion and in the presence of the pregnant woman, the physician who is to perform the abortion, the referring physician or a physician assistant (as defined in IC 25-27.5-2-10), an advanced practice nurse (as defined in IC 25-23-1-1(b)), or a midwife (as defined in IC 34-18-2-19) to whom the responsibility has

---

[8] The Practitioner may be the physician who is to perform the abortion, the referring physician, a physician assistant, advanced practice nurse, or midwife to whom the responsibility has been delegated.

been delegated by the physician who is to perform the abortion or the referring physician has informed the pregnant woman **orally and in writing** of the following:

    **(E) That human physical life begins when a human ovum is fertilized by a human sperm.**

...

    **(F) That objective scientific information shows that a fetus can feel pain at or before twenty (20) weeks of postfertilization age**.

Indiana Code § 16–34–2–1.1(a) (effective July 1, 2011) (emphasis added).

## B.  Legal Standard

The Court has already articulated the standard for a preliminary injunction and need not do so again.  However, it is worth noting that where, as here, "a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor." *Joelner v. Village of Washington Park, Illinois*, 378 F.3d 613, 620 (7th Cir. 2004) (internal citation omitted). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns,* 427 U.S. 347, 373 (1976), "and money damages are therefore inadequate." *Id*. (internal citations omitted). "Concomitantly, there can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because it is always in the public interest to protect First Amendment liberties." *Id*. (internal and citations quotations omitted). Based on these standards, the Court believes if Plaintiffs can show a likelihood of success on the merits, then the contested sections of the statute should be enjoined.

## C.  Likelihood of Success on the Merits

In order to properly analyze Plaintiffs' likelihood of success on the merits, the Court must first examine the law relating to a Practitioners' First Amendment rights in the context of informed consent requirements. The Court must then determine whether, based upon those

parameters, the statements mandated by Ind. Code § 16-34-2-1.1(a)(1)(E) and (G) constitute impermissible compelled speech.

### 1.    First Amendment Rights of Practitioners

The Supreme Court has found violations of the First Amendment where private individuals are forced to propound government-dictated messages. S*ee, e.g., Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Miami Hearld Publ'g Co. v. Tornillo,* 418 U.S. 241 (1974); *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624 (1943). "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley,* 430 U.S. at 714.

Compelled speech occurs when the state "penalizes the expression of particular points of view and forces speakers to alter their speech to conform with an agenda that they do not set." *Entertainment Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051, 1082 (N.D. Ill. 2005) (quoting *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Calif.,* 475 U.S. 1, 9 (1986)). Where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the *courier* for such message. *Wooley*, 430 U.S. at 716.

Against this greater backdrop of the First Amendment right not to speak, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) (plurality opinion), the Supreme Court considered informed consent legislation impacting the speech rights of Practitioners within the context of their practice and profession. The *Casey* Court succinctly stated:

> To be sure, the physician's First Amendment rights not to speak are implicated, *see Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State.

*Id*. at 884. (internal citations omitted).  As confirmed by *Casey*, Practitioners' First Amendment rights not to speak are implicated when a statute requires a Practitioner to disseminate particular content to patients seeking to have an abortion; however, these free speech rights are not without restriction or reasonable regulation by the state. *Id*.; *see also Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("Under our precedents it is clear the State has a significant role to play in regulating the medical profession.").

The state's interest in potential life may be advanced by legislation crafted to ensure that the woman apprehends the full consequences of her decision. *Casey*, 505 U.S. at 882-83. And, as a general matter, a state has wide latitude in imposing regulations that are designed to ensure that "a woman makes a thoughtful and informed choice." *Karlin v. Foust*, 188 F.3d 446, 491 (7th Cir. 1999). Along the same lines, the Supreme Court found that state informed consent legislation aimed at ensuring a "mature and informed" decision is permitted, even when through the legislation "the State expresses a preference for childbirth over abortion." *Casey*, 505 U.S. at 882-83.

In order to ensure that woman's choice is fully informed, the mandated statements need not be restricted to information related to the medical procedure. State informed consent legislation "need not be defined in such narrow terms that all considerations of the effect on the fetus are made irrelevant." *Id*. In *Casey*, the Supreme Court established that mandated statements relating to the nature of the procedure, the attendant health risks and those of childbirth, and the "probable gestational age" of the fetus were permitted. *Id*. "Requiring that the woman be informed of the availability of information relating to fetal development and the assistance available should she decide to carry the pregnancy to full term is a reasonable measure to ensure an informed choice, one which might cause the woman to choose childbirth over abortion."

*Casey*, 505 U.S. at 883; *Summit Medical Center of Alabama, Inc. v. Riley*, 274 F. Supp. 2d 1262, 1270 (M.D. Ala. 2003). Ultimately, the *Casey* Court found that "[i]n attempting to ensure that a woman apprehends the full consequences of her decision, the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." *Id.*

Where the required speech is truthful, non-misleading, and relevant to the patient's decision to have the abortion, no violation of the physician's right not to speak can be found without further analysis into whether the requirement was narrowly tailored to serve a compelling state interest. *Casey,* at 505 U.S. 882; *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 734 (8th Cir. 2008). The question for the Court, therefore, is whether the mandated statements required by the challenged informed consent provisions are truthful, non-misleading, and relevant to a patient's decision to have an abortion. The Court will discuss each Section in turn.

### 2.     Ind. Code § 16-34-2-1.1(a)(1)(E) – Human Physical Life

Section 16-34-2-1.1(a)(1)(E) requires that the Practitioner inform the woman seeking an abortion that "human physical life begins when a human ovum is fertilized by a human sperm." Notably, the term "human physical life" is neither a medical term nor statutorily defined.  The question arises: Does this statement amount to compelled speech in violation of Practitioners' First Amendment rights?

 The Supreme Court has been loath to address issues relating to the genesis of life.  In *Roe v. Wade*, 410 U.S. 113 (1979), the Supreme Court expressed the belief that the question of when human life begins is moral, philosophical, and theological in origin. In its ruling, the Supreme Court stated, "When those trained in the respective disciplines of medicine, philosophy,

and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer." *Id*. at 159. "We need not resolve the difficult question of when life begins." *Id*. On several occasions post-*Roe*, the Supreme Court has reaffirmed its reticence to define when human life begins. *City of Akron v. Akron Center of Reproductive Health, Inc*., 462 U.S. 416, 444 (1983) (overruled on other grounds).

Plaintiffs argue that classifying the fertilized egg and subsequent organism as a "human physical life" is an ideological statement that goes to the heart of the abortion debate and is thus impermissible compelled speech. The Commissioner disagrees, framing the statement as a biological truth conveying the fact that postfertilization, the existing living organism is indeed a "human physical life."   The Commissioner has some support for its position.   Specifically, Maureen L. Condic, Ph.D, a Professor of Neurobiology and Anatomy at the University Of Utah School Of Medicine whose primary research focuses has been the development and regeneration of the nervous system, testified as follows:

> The unique behavior and molecular composition of embryos, from their initiation at sperm-egg fusion onward, can be readily observed and manipulated in the laboratory using the scientific method. Thus, the conclusion that a human zygote is a human being (i.e. a human organism) is not a matter of religious belief, societal convention or emotional reaction. It is a matter of observable, objective, scientific fact.

(Dkt. 28-8 at 5).[9]

The Commissioner argues that the mandated statement is simply a scientific fact referring to the "full and complete, albeit developmentally immature, *human organism* [which] comes into existence at the fusion of sperm and egg." (Dkt. 28 at 3). The Commissioner further asserts that

---

[9] Dr. Condic's testimony is contrary to assertions made in Plaintiff's declarations. Having weighed the testimony of all declarants, the Court resolves this conflict in Defendants favor.

the term "human physical life" is a 'biological truism' supported by objective scientific evidence.[10] To bolster its argument, the Commissioner relies heavily on *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 742 (8th Cir. 2008). However, it is worth noting that *Rounds* made clear that its decision was based in part on the fact that "human being" was a statutorily defined term. *Id*. at 733. ("In the instant case, the district court rested its conclusion on an error of law when it ignored the statutory definition of "human being" in § 8(4) of the Act). Because the words used in Section 16-34-2-1.1(a)(1)(E) are *not* statutorily defined, they are given their plain, ordinary and usual meaning. *VanHorn v. Statem*, 889 N.E.2d 908, 911 (Ind. Ct. App. 2008); *see also Redden v. State,* 850 N.E.2d 451, 463 (Ind. Ct. App. 2006), *trans. denied.*

"In order to determine the plain and ordinary meaning of words, courts may properly consult English language dictionaries." *Id.* (quoting *Redden*, 850 N.E.2d at 463). Here, the words "human," "physical," and "life"[11] are all used frequently in common parlance. Nevertheless, Plaintiffs contend that in the context of abortion, the meaning of these words, both individually

---

[10] The Court will not delve deeply into the Commissioner's contention that a living organism is formed at successful fertilization. This point is undisputed by Plaintiffs. The issue presently before the Court is whether "physical human life" is a consummation of these undisputed medical facts regarding fertilization and the resulting living organism. Further, in *Gonzales v. Carhart*, 550 U.S. 124 (2007), the Supreme Court stated that by common understanding and scientific terminology, a fetus is a living organism while within the womb.

[11] *Compare* Merriam-Webster Collegiate Dictionary (11th ed. 2008) which defines "human" as 1) of, relating to, or characteristic of humans, 2) homo sapiens; "physical" as of or relating to natural science, having material existence, of or relating to the body; and "life" as 1) the quality that distinguishes a vital and functional being from a dead body, a principle or force that is considered to underlie the distinctive quality of animate beings, an organismic state characterized by capacity for metabolism, growth, reaction to stimuli, and reproduction, and 2) the period from birth to death, a specific phase of earthly existence *with* The American Heritage Dictionary which defines "human" as of, relating to, or characteristic of human beings; "physical'" as 'of or relating to the body as distinguished from the mind or spirit'; and "life" as 1) the property or quality that distinguishes living organisms from dead organisms and inanimate matter, manifested in functions such as metabolism, growth, reproduction, and response to stimuli or adaptation to the environment originating from within the organism, 2) the characteristic state or condition of a living organism, 3) a living being, especially a person, 4) the physical, mental, and spiritual experiences that constitute existence, 5) the interval of time between birth and death.

and in combination, represent a plethora of opinions and beliefs about life and its inception.  The Court respectfully disagrees. When read together, the language crafted by the legislature in this provision supports a finding that the mandated statement refers exclusively to a growing organism that is a member of the Homo sapiens species.

Although the Court recognizes that the term "human being" may refer to a theological, ideological designation relating to the metaphysical characteristics of life, that is not the language found before the Court today.  Rather, the inclusion of the biology-based word "physical" is significant, narrowing this statement to biological characteristics. The adjectives "human" and "physical" reveal that the legislature mandated only that the Practitioner inform the woman that at conception, a living organism of the species Homo sapiens is created. When the statement is read as a whole" it does not require a physician to address whether the embryo or fetus is a "human life" in the metaphysical sense.

Further, this Court finds that Ind. Code Section 16-34-2-1.1(a)(1)(E)'s mandated statement is not misleading. In *Casey*, the controlling opinion held that an informed consent requirement in the abortion context was "no different from a requirement that a doctor give certain specific information about any medical procedure." *Casey*, 505 U.S., at 884; *see also Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). Informed consent provisions serve not only to communicate information that would not necessarily be known to the patient, but also help the woman to make a fully informed decision. "Requiring that the woman be informed of the availability of information relating to fetal development … is a reasonable measure to ensure an informed choice." *Casey*, 505 U.S. at 883. Here, the mandated statement states only a biological fact relating to the development of the living organism; therefore, it may be reasonably read to provide accurate, non-misleading information to the patient.

38

Under Indiana law, a physician must disclose the facts and risks of a treatment which a reasonably prudent physician would be expected to disclose under like circumstances, and which a reasonable person would want to know. *Spar v. Cha*, 907 N.E.2d 974, 984 (Ind. 2009); *see also Weinberg v. Bess,* 717 N.E.2d 584, 588 n.5 (Ind. 1999). In *Casey*, the Supreme Court recognized that mandated statements need not be restricted to information related to the medical procedure, or materials concerning carrying the fetus to term. *Casey*, U.S. at 882. ("We also see no reason why the State may not require doctors to inform a woman seeking an abortion of the availability of materials relating to the consequences to the fetus, even when those consequences have no direct relation to her health."). The overarching consideration was "to ensure that a woman apprehend the full consequences of her decision," and through this, "the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." *Id*. "If the information the State requires to be made available to the woman is truthful and not misleading, the requirement may be permissible." *Id*.

The Court's ruling is reinforced by the deference owed the Indiana legislature.   The Supreme Court has articulated that "[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 329 (2006) (quoting *Regan v. Time, Inc.,* 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984)). Because Ind. Code § 16-34-2-1.1(a)(1)(E)'s mandated statement reflects only the moment, biologically speaking, a living organism of the human species is formed, the Court is not persuaded that PPIN has demonstrated a reasonable likelihood of success on the merits. As the Supreme Court has observed, "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the

burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, (1997) This Court finds that PPIN has not met its requisite burden. The Motion for Injunctive Relief as to Section 16-34-2.1.1(a)(1)(E) is **DENIED.**

### 3.      Ind. Code § 16-34-2-1.1(a)(1)(G) – Fetal Pain

Ind. Code § 16-34-2-1.1(a)(1)(G) relates to the fetus and its potential ability to feel pain. Specifically, this provision requires the Practitioner to inform the woman seeking an abortion that '*objective scientific information*' – a term statutorily defined as "data that have been reasonably derived from scientific literature and verified or supported by research in compliance with scientific methods"[12] – shows that a fetus can feel pain <u>at or before twenty (20) weeks of postfertilization age</u>. This section's mandated statement is based upon the following legislative findings, enacted as part of the bill:

1)  There is substantial medical evidence that a fetus at twenty (20) weeks of postfertilization age has the physical structures necessary to experience pain.
2)  There is substantial medical evidence that a fetus of at least twenty (20) weeks of postfertilization age seeks to evade certain stimuli in a manner similar to an infant's or adult's response to pain.
3)  Anesthesia is routinely administered to a fetus of at least twenty (20) weeks of postfertilization age when prenatal surgery is performed.
4)  A fetus has been observed to exhibit hormonal stress responses to painful stimuli earlier than at twenty (20) weeks of postfertilization age.

2011 Ind. Legis. Serv. P.L. 193-2011, Sec. 6.

The Commissioner contends that based upon the statutory definition of "objective scientific information" and the legislative findings enacted as part of the bill, Ind. Code § 16-34-2-1.1(a)(1)(G)'s statement is truthful, non-misleading, and relevant.  In the context of Plaintiffs' as-applied challenge, however, the Court respectfully disagrees.

---

[12] Ind. Code § 16-18-2-254.2 (effective July 1, 2011).

The Commissioner presents evidence in the form of articles, affidavits, declarations, and reports relating to the present research and growing science of fetal pain perception. The Commissioner principally argues that in order to be "objective scientific information" as defined by the statute and therefore truthful and non-misleading, the statement need not be the 'majority' view within the scientific community.  Instead, it need only be reasonably derived or supported by research in compliance with scientific methods. *Gonzales v. Carhart*, 550 U.S. 124, 129 (2007) ("Medical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts.").

Although this argument has merit, the Court has been given no evidence to support the finding that within the scientific community even a minority view exists that contends pain perception is possible during the first trimester of pregnancy – the time during which PPIN *exclusively* performs its abortion services.[13]  The Commissioner's evidence posits only preliminary evidence that may support the *inference* that pain is felt by a fetus at as early as *sixteen (16) weeks* postfertilization.

Evidentiary documents that  contain statements such as "the substrate and mechanisms for conscious pain perception are developed in a fetus *well before* the third trimester of human gestation,"[14] "by twenty weeks, *perhaps even earlier,* all the essential components of anatomy, physiology, and neurobiology exist to transmit painful sensations from the skin to the spinal cord and to the brain,"[15] "therapeutic response in pain receptors of fetuses at *16-21 weeks*,"[16] and "we

---

[13] Notably, PPIN performs 100% of its abortions within the first 12 weeks postfertilization and 92% of abortions performed in the state of Indiana, take place during the first trimester.

[14] Def.'s Ex. E at 2 (*A Scientific Appraisal of Fetal Pain and Conscious Sensory Perception: Hearing on H.R. 356 Before the U.S. House Committee on the Judiciary*, 109th Cong. 2 (2005) (written statement of K. J. S. Anand, MBBS, D.Phil., FAAP, FCCM, FRCPCH)).

[15] Def.'s Ex. F at 3 (*Testimony*, *Hearing on H.R. 356 Before the U.S. House Committee on the Judiciary*, 109th Cong. 1 (2005) (statement of Jean A. Wright MD MBA)).

cannot dismiss the *high likelihood of fetal pain perception before the third trimester*,"[17] do not show that a fetus at twelve weeks or earlier of postfertilization can feel pain.  Nor do they support a view that has been reasonably derived from scientific literature and verified or supported by research in compliance with scientific methods. Even in its own statement of facts, the Commissioner admits only that "[m]ultiple lines of scientific evidence converge to support the conclusion that the human fetus can experience pain from 20 weeks of gestation, and *possibly as early as 16 weeks of gestation*." (Dkt. 28 at 3) (emphasis added). Importantly, the Commissioner conceded at oral arguments that to his knowledge, there is no objective scientific information that a fetus can feel pain at 12 weeks.

Because PPIN exclusively performs abortion services on patients in their first trimester, this Court finds that Plaintiffs have provided sufficient evidence demonstrating that requiring PPIN Practitioners to state that "objective scientific information shows that a fetus can feel pain at or before twenty week of postfertilization age" may be false, misleading, and irrelevant.  In this as-applied challenge, PPIN has demonstrated likelihood of success on the merits.   When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor.  Here, the Court has found that Plaintiffs' possess the requisite likelihood of success on the merits that the mandated statement found in § 16-34-2-1.1(a)(1)(G) would constitute impermissible compelled speech. The loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury.

---

[16] Def.'s Ex. G at 3 (Decl. of Jean A. Wright).

[17] Def.'s Ex. E, A scientific appraisal of Fetal Pain and Conscious Sensory Perception, Written testimony of: K. J. S. Anand, MBBS, D.Phil., FAAP, FCCM, FRCPCH.

In its briefing, the Commissioner addressed the possibility that the Court might find it misleading to tell a first-trimester patient that her fetus would feel pain at or before twenty weeks postfertilization. (Dkt. 28 at 31). Relying on *Ayotte*, 546 U.S. at 328-29, the Commissioner argues that facial invalidation is disfavored, even in abortion-regulation cases, and that the Court may not enjoin application of the provision in its entirety. The Court is persuaded. The enjoining of § 16-34-2-1.1(a)(1)(G), as applied only to Plaintiffs, cannot be shown to inflict irreparable harm to Defendants when the injunction prevents the enforcement of a potentially unconstitutional statute.  It is always in the public interest to protect First Amendment liberties. Although a preliminary injunction is an "extraordinary remedy," based upon the aforementioned analysis, the Court finds that Plaintiffs have made the requisite showing.   Accordingly, the Court **GRANTS** Plaintiffs' Motion and enjoins the enforcement of Ind. Code § 16-34-2-1.1(a)(1)(G) as applied to Plaintiffs' performance of first-trimester abortions.

## V. CONCLUSION

For the reasons set forth below, Plaintiffs' Motion for Preliminary Injunction (Dkt. 9) is **GRANTED** with respect to the defunding provision, **DENIED** with respect to Ind. Code § 16-34-2-1.1(a)(1)(E) and **GRANTED** with respect to Ind. Code § 16-34-1.1(a)(1)(G) as applied to Plaintiffs only.

A preliminary injunction is therefore issued in this case as follows:

(1) All attempts to stop current or future funding contracted for or due PPIN should be enjoined and defendants ISDH, Director of the Indiana State Budget Agency, Commissioner of the Indiana Department of Administration, and FSSA should be enjoined to take all steps to insure that all monies are paid.

(2) The informed consent provision of Ind. Code § 16-34-2-1.1(a)(1)(E) shall be enjoined as applied to Plaintiffs, and Defendants ISHD and the Marion, Monroe and Tippecanoe County Prosecutors shall be enjoined from taking any actions against Plaintiffs for failure to comply with this provision as-applied to first trimester abortions only.

The issuance of a preliminary injunction will not impose any monetary injuries.  In the absence of such injuries, **NO BOND** is required.

**IT IS SO ORDERED**.

Date: 06/24/2011

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Adam Clay
INDIANA ATTORNEY GENERAL
Adam.Clay@atg.in.gov

Thomas M. Fisher
INDIANA OFFICE OF THE ATTORNEY
GENERAL
tom.fisher@atg.in.gov

Heather McVeigh
INDIANA OFFICE OF THE ATTORNEY
GENERAL
hmcveigh@atg.in.gov

Eric Allan Koch
THE KOCH LAW FIRM
eric@thekochlawfirm.com

Paul B. Linton
pblconlaw@aol.com

Thomas Brejcha
29 South LaSalle Street, Suite 440
Chicago, Illinois  60603

Ethan Price Davis
UNITED STATES DEPARTMENT OF
JUSTICE
ethan.p.davis@usdoj.gov

Joseph Wilfred Mead
UNITED STATES DEPARTMENT OF
JUSTICE
joseph.w.mead@usdoj.gov

Tamra Tyree Moore
UNITED STATES DEPARTMENT OF
JUSTICE
tamra.moore@usdoj.gov