# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

December 17, 2012

To:   Laura A. Briggs
      UNITED STATES DISTRICT COURT
      Southern District of Indiana
      United States Courthouse
      Indianapolis , IN 46204-0000

| No.: 11-2464 | PLANNED PARENTHOOD OF INDIANA, INCORPORATED, et al., Plaintiffs - Appellees<br><br>v.<br><br>COMMISSIONER OF THE INDIANA STATE DEPARTMENT OF HEALTH, in his official capacity, et al., Defendants - Appellants |
| --- | --- |

| **Originating Case Information:** |
| --- |
| District Court No: 1:11-cv-00630-TWP-DKL<br>Southern District of Indiana, Indianapolis Division<br>District Judge Tanya Walton Pratt |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to

costs shall constitute the mandate.

RECORD ON APPEAL STATUS:                   No record to be returned

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                      **Received by:**

12/17/12                                   *Theresa M. Amato*
_____                  _____

form name: **c7_Mandate**(form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## FINAL JUDGMENT

October 23, 2012

**CERTIFIED COPY**

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

Before:

RICHARD D. CUDAHY, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

| | |
|---|---|
| No.: 11-2464 | PLANNED PARENTHOOD OF INDIANA, INCORPORATED, et al., Plaintiffs - Appellees <br><br> v. <br><br> COMMISSIONER OF THE INDIANA STATE DEPARTMENT OF HEALTH, et al., Defendants - Appellants |

**Originating Case Information:**

District Court No: 1:11-cv-00630
Southern District of Indiana, Indianapolis Division
District Judge Tanya Walton Pratt

We **AFFIRM** the district court's order granting preliminary injunctive relief on Planned Parenthood's Medicaid Act claim. We **REVERSE** the order as it relates to the State's § 247c(c) block-grant funding and **REMAND** the case with instructions to modify the injunction accordingly. The above is in accordance with the decision of this court entered on this date. Each side to bear its own costs.

form name: **c7_FinalJudgment**(form ID: **132**)

In the

# United States Court of Appeals

## For the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

_[signature]_

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

No. 11-2464

PLANNED PARENTHOOD OF INDIANA, INC., et al.,

*Plaintiffs-Appellees,*

*v.*

COMMISSIONER OF THE INDIANA STATE
DEPARTMENT OF HEALTH, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:11-cv-00630-TWP-TAB—**Tanya Walton Pratt**, *Judge.*

ARGUED OCTOBER 20, 2011—DECIDED OCTOBER 23, 2012

Before CUDAHY, KANNE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.*   In 2011 Indiana adopted a law prohibiting state agencies from providing state or federal funds to "any entity that performs abortions or maintains or operates a facility where abortions are performed." IND. CODE § 5-22-17-5.5(b). The Hyde Amendment already forbids states from using federal funds to pay for most nontherapeutic abortions; Indiana has a

similar ban on the use of state funds. The new law goes a step further by prohibiting abortion providers from receiving *any* state-administered funds, even if the money is earmarked for other services. The point is to eliminate the indirect subsidization of abortion.

Immediately after the defunding law was enacted, Planned Parenthood of Indiana and several individual plaintiffs filed this lawsuit seeking to block its implementation.[1] As an enrolled Medicaid provider, Planned Parenthood provides reimbursable medical services to low-income patients, two of whom are named as plaintiffs. Planned Parenthood claims that the defunding law violates the Medicaid Act's "free choice of provider" provision, which requires state Medicaid plans to allow patients to choose their own medical provider. *See* 42 U.S.C. § 1396a(a)(23). The United States, as amicus curiae, supports this claim. Planned Parenthood also contends that the defunding law is preempted by a federal block-grant statute that authorizes the Secretary of Health and Human Services ("HHS") to make

---

[1] The plaintiffs are Planned Parenthood of Indiana, one of its doctors, and two Indiana residents who receive Medicaid services from Planned Parenthood clinics. We refer to the plaintiffs collectively as "Planned Parenthood" unless the context requires otherwise. The defendants are the Commissioner of the Indiana State Department of Health and several other state department heads, the Indiana General Assembly, and the state prosecutors of Marion, Monroe, and Tippecanoe Counties. We refer to the defendants collectively as "Indiana" unless the context requires otherwise.

No. 11-2464                                                    3

grants to the states for programs related to sexually transmitted diseases. *See* 42 U.S.C. § 247c(c). Finally, Planned Parenthood claims that the defunding law places an unconstitutional condition on its receipt of state-administered funds because it must choose between providing abortion services and receiving public money.

The district court held that the first two claims were likely to succeed and enjoined Indiana from enforcing the defunding law with respect to Planned Parenthood's Medicaid and § 247c(c) grant funding. The court did not address the unconstitutional-conditions claim. Indiana appealed.

We affirm in part and reverse in part. A threshold question on the two statutory claims is whether the plaintiffs have a right of action. To create private rights actionable under 42 U.S.C. § 1983, the statutes in question must meet the requirements of *Gonzaga University v. Doe*, 536 U.S. 273 (2002). The free-choice-of-provider statute does. Under § 1396a(a)(23) state Medicaid plans "must" allow beneficiaries to obtain medical care from "any institution, agency, . . . or person, qualified to perform the service." This is individual-rights language, stated in mandatory terms, and interpreting the right does not strain judicial competence. *See Gonzaga Univ.*, 536 U.S. at 284.

Planned Parenthood is likely to succeed on this claim. Although Indiana has broad authority to exclude unqualified providers from its Medicaid program, the State does not have plenary authority to exclude a class of providers for *any* reason—more particularly, for a

reason unrelated to provider qualifications. In this context, "qualified" means fit to provide the necessary medical services—that is, capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner. The defunding law excludes Planned Parenthood from Medicaid for a reason unrelated to its fitness to provide medical services, violating its patients' statutory right to obtain medical care from the qualified provider of their choice.

The remaining claims are not likely to succeed, however, so the scope of the injunction must be modified. First, the block-grant statute does not create private rights actionable under § 1983, and the district court's conclusion that the Supremacy Clause supplies a preemption claim of its own force is probably wrong. In any event, the defunding law does not conflict with § 247c(c), which attaches no strings to the federal money other than a general requirement that the recipient state spend it on programs for the surveillance of sexually transmitted diseases. Finally, the unconstitutional-conditions claim does not supply an alternative basis for relief. This doctrine, sometimes murky, requires close attention to the potentially implicated right. Here, Planned Parenthood's claim is entirely derivative of a woman's right to obtain an abortion. It is settled law that the government's refusal to subsidize abortion does not impermissibly burden a woman's right to obtain an abortion. If a ban on public funding for abortion does not *directly* violate the abortion right, then Indiana's ban on other forms of public subsidy for abortion providers cannot be an unconstitutional condition that *indirectly* violates the right.

## I. Background

Medicaid "is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990). Indiana participates in Medicaid, and as a condition of receiving federal funds, its Medicaid program must comply with federal requirements. *See* 42 U.S.C. § 1396a(a); *see also Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003) ("[O]nce a state elects to participate [in Medicaid], it must abide by all federal requirements and standards as set forth in the Act."). Assuming the federal requirements are met, states have "substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in 'the best interests of the recipients.'" *Alexander v. Choate*, 469 U.S. 287, 303 (1985) (quoting 42 U.S.C. § 1396a(a)(19)).

To ensure compliance with federal rules, participating states must submit proposed Medicaid plans and any subsequent amendments to the Centers for Medicare and Medicaid Services ("CMS") for approval.[2] *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1208 (2012). The HHS Secretary may withhold Medicaid funding—either in whole or in part—from any state whose plan does not comply with federal requirements. *See* 42 U.S.C. § 1396c; 42 C.F.R. § 430.12(c); *cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2607-08 (2012).

---

[2] CMS is a division of HHS.

At issue here is the Medicaid Act's requirement that state Medicaid plans "must . . . provide that . . . any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required." 42 U.S.C. § 1396a(a)(23); *see also* 42 C.F.R. § 431.51(b)(1) (requiring that a state plan provide that "a recipient may obtain Medicaid services from any institution . . . that is [q]ualified to furnish the services[] . . . and [w]illing to furnish them to that particular recipient"). This is known as the free-choice-of-provider requirement.

## A. Indiana House Enrolled Act 1210, the Abortion-Provider Defunding Law

In the spring of 2011, the Indiana General Assembly adopted a law prohibiting abortion providers from receiving any state contracts and grants, including those involving state-administered federal funds. More specifically, the defunding law provides that state agencies "may not[] enter into a contract with[] or make a grant to[] any entity that performs abortions or maintains or operates a facility where abortions are performed." IND. CODE § 5-22-17-5.5(b). The new law, known as House Enrolled Act 1210, also cancelled existing contracts with abortion providers. *See id.* § 5-22-17-5.5(c), (d). The defunding law does not apply to hospitals and ambulatory surgical centers. *See id.* § 5-22-17-5.5(a).

Act 1210 fills a gap in Indiana law regarding public funding of abortion. The Hyde Amendment prohibits the

No. 11-2464                                                 7

use of federal funds to pay for nontherapeutic abortions except in the case of pregnancies resulting from rape or incest.[3] Indiana law contains similar restrictions on the use of state funds. *See id.* §§ 12-15-5-1(17), 16-34-1-2; 405 IND. ADMIN. CODE 5-28-7; *Humphreys v. Clinic for Women, Inc.*, 796 N.E.2d 247, 250-51 (Ind. 2003). Act 1210 aims to prevent the indirect subsidization of abortion by stopping the flow of all state-administered funds to abortion providers.

Governor Mitch Daniels signed Act 1210 into law on May 10, 2011. On May 13 Indiana notified CMS of the change in its law and sought approval for an amendment to its Medicaid plan to exclude any provider (not including hospitals and ambulatory surgical centers) that offers abortion services. After consulting with the HHS Secretary, *see* 42 C.F.R. § 430.15(c), the CMS Administrator rejected the proposed plan amendment citing § 1396a(a)(23), the free-choice-of-provider rule. In a letter to Indiana's Director of Medicaid Policy & Planning, the Administrator noted that "federal Medicaid funding of abortion services is not permitted under federal law except in extraordinary circumstances (such as in cases of rape or incest)." "At the same time," the Administrator continued, "Medicaid programs may not exclude qualified health care

---

[3] The Hyde Amendment is actually a rider Congress attaches to appropriations legislation each year. *See* Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, §§ 506-507, 125 Stat. 786, 1111-12 (2011).

providers from providing services that are funded under the program because of a provider's scope of practice." Because Indiana's proposed amendment excluded abortion providers from participation in Medicaid for a reason unrelated to provider qualifications, the Administrator refused to approve it.

Indiana petitioned for reconsideration of the Administrator's decision. *See* 42 U.S.C. § 1316(a)(2); 42 C.F.R. § 430.18. This initiated an administrative appeal process that included a hearing, *see* 42 C.F.R. §§ 430.76(a), 430.83, and the right to seek judicial review of the final decision, *see* 42 U.S.C. § 1316(a)(3); 42 C.F.R. § 430.38. The hearing was held on December 15, 2011, and on June 20, 2012, the hearing officer sent the Administrator his recommended findings and a proposed decision upholding the initial determination. *See* 42 C.F.R. § 430.102. Under 42 C.F.R. § 430.102(b)(2), the parties have an opportunity to file objections before final action on the recommendation is taken. To our knowledge, a final agency decision has not yet been issued.

## B. Planned Parenthood's Legal Challenge to Act 1210

Planned Parenthood is a nonprofit healthcare provider offering reproductive healthcare and family-planning services in Indiana, including preventive primary-care services such as medical examinations, cancer screenings, testing for sexually transmitted diseases, and various birth-control services. The organization operates 28 health clinics in Indiana and has more than 75,000 patients. Planned Parenthood is an enrolled provider in Indiana's

No. 11-2464                                                9

Medicaid program. In 2010 the organization offered Medicaid services to more than 9,300 patients and received $1,360,437 in Medicaid reimbursement. Planned Parenthood also receives grants from Indiana state agencies, including some funded with federal money. Among those in effect when Act 1210 was adopted were two grants totaling $150,000 from Indiana's federal Disease Intervention Services block-grant money received under § 247c(c), which authorizes grants for programs that diagnose and monitor sexually transmitted diseases.

Planned Parenthood also performs abortions. The organization uses private funding to support its abortion services and takes steps to ensure that public and private funds are not commingled. As an abortion provider, Planned Parenthood is barred by Act 1210 from receiving any state-administered funds, including Medicaid reimbursement and funding from state and federal grants for services unrelated to abortion. The organization estimates that full implementation of the defunding law would require it to close a quarter of its health clinics, lay off approximately 37 employees, and cease serving an unknown number of patients.

Because of the effect of the defunding law on its statewide operations, Planned Parenthood did not wait for the outcome of the CMS administrative process. On May 10, 2011—the same day that Governor Daniels signed Act 1210 into law—Planned Parenthood went to court in the Southern District of Indiana seeking to block the new law. Its lawsuit challenges Act 1210 on several grounds. First, Planned Parenthood alleges that the law

violates § 1396a(a)(23), the Medicaid free-choice-of-pro-
vider requirement. The complaint also asserts a preemp-
tion claim based on several federal block-grant programs.
Finally, Planned Parenthood alleges that the defunding
law imposes an unconstitutional condition on its
receipt of public funds by forcing it to choose between
performing abortions and receiving nonabortion-related
public funding. The complaint seeks declaratory and
injunctive relief under § 1983. Planned Parenthood im-
mediately moved for a temporary restraining order
("TRO") and a preliminary injunction.[4]

The district court denied the motion for a TRO, but
after full briefing granted Planned Parenthood's motion
for a preliminary injunction. *Planned Parenthood of Ind., Inc.
v. Comm'r of the Ind. State Dep't of Health*, 794 F. Supp. 2d
892 (S.D. Ind. 2011). As relevant here, the court held that
§ 1396a(a)(23) creates individual rights enforceable
under § 1983 and that Planned Parenthood was likely
to succeed on its claim that the defunding law violates
§ 1396a(a)(23). On the preemption claim, the court
focused solely on the Disease Intervention Services block-
grant program under § 247c(c). The court held that al-
though § 247c(c) does not confer an individual right,

---

[4] Planned Parenthood also challenges two provisions in Act
1210 that amended Indiana's informed-consent statute to
require abortion practitioners to inform patients that "human
physical life begins when a human ovum is fertilized by a
human sperm" and that "objective scientific information
shows that a fetus can feel pain at or before twenty (20) weeks
of postfertilization age." IND. CODE § 16-34-2-1.1(a)(1)(E), (G).
These aspects of the case are not at issue in this appeal.

No. 11-2464                                          11

Planned Parenthood could bring its preemption claim directly under the Supremacy Clause. Having found a right of action, the court concluded that Planned Parenthood was likely to succeed on its claim that § 247c(c) preempts Act 1210. The court then assessed the balance of harms and the public interest, ultimately concluding that preliminary injunctive relief was warranted. The court enjoined "[a]ll attempts to stop current or future funding contracted for or due" Planned Parenthood and ordered Indiana to "take all steps to insure that all monies are paid." *Id.* at 921. Having awarded all the preliminary relief Planned Parenthood had requested, the court did not address the unconstitutional-conditions claim.

## II. Discussion

This case comes to us on Indiana's appeal from the district court's order granting a preliminary injunction. *See* 28 U.S.C. § 1292(a)(1). To obtain a preliminary injunction, the moving party must demonstrate a reasonable likelihood of success on the merits, no adequate remedy at law, and irreparable harm absent the injunction. *See Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613, 619 (7th Cir. 2004). If it makes this threshold showing, the district court weighs the balance of harm to the parties if the injunction is granted or denied and also evaluates the effect of an injunction on the public interest. *See Alvarez*, 679 F.3d at 589-90; *Christian Legal Soc'y*, 453 F.3d at 859. The strength of

the moving party's likelihood of success on the merits affects the balance of harms. "The more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008). We review the district court's factual findings for clear error, its legal conclusions de novo, and its balancing of the injunction factors for an abuse of discretion. *Christian Legal Soc'y*, 453 F.3d at 859; *Joelner*, 378 F.3d at 620.

Here, the relevant facts are not in dispute. Planned Parenthood's motion raised legal questions about the existence of private statutory rights enforceable under § 1983 and whether Act 1210 conflicts with federal law or violates the unconstitutional-conditions doctrine. The motion also called for a discretionary judgment about the balance of harms and the effect of an injunction on the public interest.

## A.  The Medicaid Act Claim

### 1.  *Is There a Private Right of Action Enforceable Under § 1983?*

Section 1983 creates a federal remedy against anyone who, under color of state law, deprives "any citizen of the United States . . . of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. In *Maine v. Thiboutot*, 448 U.S. 1 (1980), the Supreme Court held that § 1983 "means what it says," *id.* at 4, and "authorizes suits to enforce individual rights under federal statutes as well as the Constitution," *City*

No. 11-2464                                    13

*of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 119 (2005). But "it is *rights,* not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." *Gonzaga Univ.*, 536 U.S. at 283.

Three factors help determine whether a federal statute creates private rights enforceable under § 1983: (1) "Congress must have intended that the provision in question benefit the plaintiff"; (2) the asserted right must not be "so vague and amorphous that its enforcement would strain judicial competence"; and (3) "the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Blessing v. Freestone*, 520 U.S. 329, 340-41(1997) (internal quotation marks omitted). These factors are meant to set the bar high; nothing "short of an unambiguously conferred right [will] support a cause of action brought under § 1983." *Gonzaga Univ.*, 536 U.S. at 283. "[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286.

In the context of legislation adopted under the spending power,[5] this rigorous approach reflects concerns about federalism and reinforces the principle that Congress must clearly express its "intent to

---

[5] *See* U.S. CONST. art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes . . . to pay the Debts and provide for the . . . general Welfare of the United States . . . .").

impose conditions on the grant of federal funds so that
the States can knowingly decide whether or not to accept
those funds." *Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1, 24 (1981); *see also Arlington Cent. Sch. Dist. Bd.
of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (requiring
that spending statutes provide "clear notice" of state
obligations). *Pennhurst* analogized cooperative Spending
Clause legislation to a contract between the federal gov-
ernment and willing states: "[L]egislation enacted
pursuant to the spending power is much in the nature of
a contract: in return for federal funds, the States agree
to comply with federally imposed conditions." 451 U.S.
at 17. As such, the legitimacy of spending-power legisla-
tion "rests on whether the State voluntarily and
knowingly accepts the terms of the 'contract.'" *Id.* There
cannot be knowing acceptance "if a State is unaware of
the conditions or is unable to ascertain what is expected
of it." *Id.; see also Arlington Cent. Sch. Dist.*, 548 U.S. at
296. The Supreme Court has repeatedly reaffirmed this
understanding, most recently in *National Federation
of Independent Business v. Sebelius*, 132 S. Ct. at 2601-02.

Accordingly, "where a statute by its terms grants no
private rights to any identifiable class," *Gonzaga Univ.*,
536 U.S. at 284 (internal quotation marks omitted), it
cannot be construed to confer an individual right en-
forceable under § 1983, *id.* at 284-85. Instead, to
create judicially enforceable private rights, the statute
"'must be phrased in terms of the persons benefited,'"
with "'an *unmistakable focus* on the benefited class.'" *Id.*
(quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 691, 692 n.13
(1979)). It must "confer[] entitlements 'sufficiently specific

and definite to qualify as enforceable rights.'" *Id.* at 280 (quoting *Wright v. Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 432 (1987)). In other words, the statute must contain "rights-creating language" that unambiguously creates an "'*individual* entitlement.'" *Id.* at 287 (quoting *Blessing*, 520 U.S. at 343).

"Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Id.* at 284. The defendant may defeat this presumption by demonstrating "that Congress shut the door to private enforcement either expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 284 n.4 (internal quotation marks and citations omitted); *see also Wilder*, 496 U.S. at 520-21; *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981) (holding that there is no enforceable private right where the statute itself creates a remedial scheme that is "sufficiently comprehensive . . . to demonstrate congressional intent to preclude the remedy of suits under § 1983").

Applying these principles here, we agree with the district court that the free-choice-of-provider statute unambiguously gives Medicaid-eligible patients an individual right. Section 1396a(a)(23) mandates that all state Medicaid plans provide that "any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required." Medicaid patients are the obvious

intended beneficiaries of the statute; it states that *any* Medicaid-eligible person may obtain medical assistance from *any* institution, agency, or person qualified to perform that service. In other words, Medicaid patients have the right to receive care from the qualified provider of their choice. This language does not simply set an aggregate plan requirement, but instead establishes a personal right to which all Medicaid patients are entitled. *Gonzaga Univ.*, 536 U.S. at 288 (contrasting a statute with an "aggregate" focus with one that is focused on the needs of an identified class of persons). Section 1396a(a)(23) uses "individually focused terminology," *id.* at 287, unmistakably "'phrased in terms of the persons benefitted,'" *id.* at 284 (quoting *Cannon*, 441 U.S. at 692 n.13).

Second, the right is administrable and falls comfortably within the judiciary's core interpretive competence. Planned Parenthood argues that a state infringes the free-choice-of-provider right when it excludes a provider from its Medicaid program for a reason other than the provider's fitness to render the medical services required. Whether this is the proper interpretation of § 1396a(a)(23) is a legal question fully capable of judicial resolution.

Finally, § 1396a(a)(23) is plainly couched in mandatory terms. It says that all states "must provide" in their Medicaid plans that beneficiaries may obtain medical care from any provider qualified to perform the service. In sum, the free-choice-of-provider statute explicitly refers to a specific class of people—Medicaid-eligible

patients—and confers on them an individual entitle-ment—the right to receive reimbursable medical services from any qualified provider. We agree with the district court that § 1396a(a)(23) unambiguously creates private rights "presumptively enforceable by § 1983." *Gonzaga Univ.*, 536 U.S. at 284.

Nothing in the Medicaid Act suggests, explicitly or implicitly, that "Congress specifically foreclosed a remedy under § 1983." *Id.* at 284 n.4 (internal quotation marks omitted). Indiana points to the Medicaid Act's general administrative scheme—more specifically, to the HHS Secretary's authority to review state plans for com-pliance and withhold or curtail Medicaid funds as a means of bringing noncompliant states into line. *See* 42 U.S.C. §§ 1316(a), 1396c; 42 C.F.R. § 430.12(c). The State suggests that this feature of the administrative scheme implies that Congress foreclosed private enforcement of § 1396a(a)(23). But the Secretary's power to shut off all or part of a state's funding is not a "comprehensive enforcement scheme," *see Gonzaga Univ.*, 536 U.S. at 284 n.4, nor does the administrative-approval process for plan amendments provide an avenue for beneficiaries to vindicate their free-choice-of-provider rights, *cf. Middlesex Cnty. Sewerage Auth.*, 453 U.S. at 20 (ex-plaining that where a federal statute provides "its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under § 1983").

It would be a different matter if Congress had provided an administrative remedy for individual patients. "The

18                                        No. 11-2464

provision of an express, private means of redress in
the statute itself is ordinarily an indication that Congress
did not intend to leave open a more expansive remedy
under § 1983." *Rancho Palos Verdes*, 544 U.S. at 121. But
Congress did not provide a means of private redress
here. And private enforcement of § 1396a(a)(23) in suits
under § 1983 in no way interferes with the Secretary's
prerogative to enforce compliance using her administra-
tive authority. Indeed, addressing a different subsection
of § 1396a(a), the Supreme Court has held that the
Medicaid Act's "administrative scheme cannot be con-
sidered sufficiently comprehensive to demonstrate a
congressional intent to withdraw the private remedy
of § 1983." *Wilder*, 496 U.S. at 522. *Wilder* held that the
Boren Amendment, which established a standard for
Medicaid reimbursement of hospitals, nursing homes,
and intermediate-care facilities, is enforceable under
§ 1983. *Id.* (holding that 42 U.S.C. § 1396a(a)(13)(A) is
enforceable in a suit under § 1983).

Our conclusion finds support in decisions from other
circuits. In *Harris v. Olszewski*, 442 F.3d 456, 459 (6th Cir.
2006), the Sixth Circuit squarely addressed this
issue and held that § 1396a(a)(23) uses the kind of rights-
creating, mandatory language required to create
individual rights enforceable under § 1983. The court
went on to note that although

> there may be legitimate debates about the medical
> care covered by or exempted from the freedom-of-
> choice provision, the mandate itself does not
> contain the kind of vagueness that would push the
> limits of judicial enforcement. Whether a state

plan provides an individual with the choice specified in the provision is likely to be readily apparent . . . .

*Id.* at 462. Finally, the court observed that the Medicaid Act does not "explicitly or implicitly foreclose the private enforcement of this statute through § 1983 actions." *Id.* More particularly, the Act "does not provide other methods for private enforcement." *Id.* In short, applying the *Gonzaga University* test, the Sixth Circuit concluded that § 1396a(a)(23) "creates enforceable rights that a Medicaid beneficiary may vindicate through § 1983."[6] *Id.* at 461.

Other circuits have reached the same conclusion in cases involving individual suits for violation of § 1396a(a)(8), which requires that state Medicaid plans "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8); *see Doe v. Kidd*, 501 F.3d 348, 355-57 (4th Cir. 2007); *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 189-93 (3d Cir. 2004); *Bryson v. Shumway*, 308 F.3d 79, 88-89 (1st Cir. 2002); *Doe ex rel.*

---

[6] The Eleventh Circuit agrees, albeit in a case decided prior to *Gonzaga University*. *See Silver v. Baggiano*, 804 F.2d 1211, 1218 (11th Cir. 1986), *abrogated on other grounds by Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 523 U.S. 613 (2002) (holding that "Medicaid recipients do have enforceable rights under § 1396a(a)(23)").

*Doe v. Chiles*, 136 F.3d 709, 715-19 (11th Cir. 1998).[7] And we have recently followed the lead of our sister circuits in finding an enforceable individual right in yet another provision of § 1396a(a)—subsection (10), which requires that state Medicaid plans "must . . . provide . . . for making medical assistance available . . . to all [eligible] individuals." *See Bontrager v. Ind. Family & Soc. Servs. Admin.*, No. 11-3710, 2012 WL 4372524, *6 (7th Cir. Sept. 26, 2012) (citing *Watson v. Weeks*, 436 F.3d 1152, 1159-61 (9th Cir. 2006); *Sabree*, 367 F.3d at 189-92; *South Dakota ex rel. Dickson v. Hood*, 391 F.3d 581 604-06 (5th Cir. 2004)). The free-choice-of-provider provision uses language far more concrete and individually focused than either subsection (8) or (10) of § 1396a(a). Indiana's position is hard to reconcile with *Wilder* and a fair amount of precedent from this and other circuits.[8]

Against this authority, Indiana insists that legislation adopted under Congress's spending power cannot create individual rights enforceable under § 1983 because its legal force stems from a state's acceptance of federal

---

[7]  We have assumed without deciding that § 1396a(a)(8) creates an enforceable individual right. *See Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 457 (7th Cir. 2007) ("This circuit has itself assumed after *Gonzaga University* that § 1396a(a)(8) may be enforced via § 1983.").

[8]  One district-court decision supports Indiana's argument. *See M.A.C. v. Betit*, 284 F. Supp. 3d 1298, 1307 (D. Utah 2003). As the Sixth Circuit has observed, however, that opinion offers virtually no analysis of the issue. *See Harris v. Olszewski*, 442 F.3d 456, 463 (6th Cir. 2006).

funding rather than from the law itself. This categorical argument cannot be correct; if it were, then the elaborate doctrine worked out in *Gonzaga University* and its predecessors was completely unnecessary. Not too long ago we made this very point, observing that the Supreme Court's recent statutory-right-of-action cases "do not stand for a broad rule that spending power statutes can never be enforced by private actions" under § 1983. *Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin.*, 603 F.3d 365, 378 (7th Cir. 2010) (en banc).

Taking a slightly different tack, Indiana argues that the free-choice-of-provider statute does not create privately enforceable rights because the conditions listed in § 1396a(a) are simply criteria for federal reimbursement, not *requirements* that must be met by participating states. In other words, noncompliance with the conditions listed in § 1396a(a) puts the State at risk of losing its federal Medicaid funding but does not constitute a violation of federal law.[9] To be sure, non-

---

[9] In a related argument, Indiana maintains that federal statutes specifying the requirements of state Medicaid plans cannot impose legal obligations on state officials. Congress specifically foreclosed this argument when it enacted 42 U.S.C. § 1320a-2, which states that a provision of the Medicaid Act "is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." *See Harris v. James*, 127 F.3d 993, 1003 (11th Cir. 1997) (explaining that § 1320a-2 establishes that "the mere fact that an obligation is couched in

(continued...)

22                                        No. 11-2464

compliance with the requirements of § 1396a(a) may
serve as a basis for the Secretary's disapproval of a
state's Medicaid plan and withholding of Medicaid
funds, but that does not mean that § 1396a(a) functions
only as a condition precedent to the federal government's
obligation to keep its end of the Medicaid bargain.
Federal statutes enacted pursuant to the spending power
do not create federal rights or obligations of their
own force, but "once a state elects to participate [in
Medicaid], it must abide by all federal requirements and
standards as set forth in the Act." *Collins*, 349 F.3d at
374 (citing *Wilder*, 496 U.S. at 502); *see also Alexander*,
469 U.S. at 289 n.1. As we have explained, the contract
model for interpreting Spending Clause legislation
has important implications for the relationship between
the federal government and the states, *see Nat'l Fed'n
of Indep. Bus.*, 132 S. Ct. at 2601-03; *Pennhurst*, 451 U.S. at
17, but it does not follow that Spending Clause legisla-
tion can *never* create judicially enforceable individual
rights.

   Finally, Indiana argues that allowing private enforce-
ment of the free-choice-of-provider requirement would
conflict with *O'Bannon v. Town Court Nursing Center*, 447
U.S. 773 (1980), and *Kelly Kare, Ltd. v. O'Rourke*, 930

---

[9] (...continued)
a requirement that the State file a plan is not itself
sufficient grounds for finding the obligation unenforceable
under § 1983").

F.2d 170 (2d Cir. 1991). We disagree. In *O'Bannon* the Supreme Court held that a state need not provide a pre-termination hearing to Medicaid beneficiaries when state officials terminate a medical provider (in that case, a nursing home) as unfit to participate in Medicaid. 447 U.S. at 785. The Court explained its holding as follows:

> [T]he Medicaid provisions relied upon by the Court of Appeals do not confer a right to continued residence in a home of one's choice. Title 42 U.S.C. § 1396a(a)(23) . . . gives [Medicaid] recipients the right to choose among a range of *qualified* providers, without government interference. By implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified. But it clearly does not confer a right on a recipient to enter an unqualified home and demand a hearing to certify it, nor does it confer a right on a recipient to continue to receive benefits for care in a home that has been decertified.

*Id.*

Similarly, in *Kelly Kare* the free-choice-of-provider statute was raised in the context of a due-process claim. A home-healthcare provider and its patients alleged that they were deprived of due process when the State cancelled the provider's contract based on allegations of unfitness without providing a pre-termination hearing. Relying on *O'Bannon,* the Second Circuit rejected the claim:

> We read *O'Bannon* as holding that a Medicaid recipient's freedom of choice rights are necessarily dependent on a provider's ability to render services. No cognizable property interest can arise in the Medicaid recipient unless the provider is both qualified and participating in the Medicaid program.

*Kelly Kare*, 930 F.2d at 178.

Neither *O'Bannon* nor *Kelly Kare* supports Indiana's argument. This is not a due-process case. Planned Parenthood and its patients are not suing for violation of their *procedural* rights; they are making a *substantive* claim that Indiana's defunding law violates § 1396(a)(23). As the Supreme Court explained in *O'Bannon*, § 1396a(a)(23) "gives [Medicaid] recipients the right to choose among a range of *qualified* providers." 447 U.S. at 785. This language reinforces rather than undermines our conclusion that § 1396a(a)(23) confers individual rights enforceable under § 1983.

### 2. *Does the Defunding Law Violate § 1396a(a)(1)?*

Indiana argues that even if § 1396a(a)(23) confers an individual right, the states may establish provider qualifications that effectively limit that right. It is true that Medicaid regulations permit the states to establish "reasonable standards relating to the qualifications of providers." 42 C.F.R. § 431.51(c)(2). But Indiana claims plenary authority to exclude Medicaid providers for *any* reason, as long as it furthers a legitimate state interest—here, the State's interest in avoiding indirect

subsidization of abortion. This sweeping claim conflicts with the unambiguous language of § 1396a(a)(23) and finds no support in related Medicaid statutes and regulations.

To repeat, § 1396a(a)(23) requires that state Medicaid plans must provide that "any individual eligible for medical assistance . . . may obtain such assistance from *any* institution, agency, community pharmacy, or person, *qualified to perform the service or services required.*" 42 U.S.C. § 1396a(a)(23) (emphases added). The Act does not define what it means for a provider to be "qualified," and the term is not self-defining. *See* BLACK'S LAW DICTIONARY 1360 (9th ed. 2009) (defining "qualified" as "[p]ossessing the necessary qualifications; capable or competent"). Medicaid regulations provide that the states may establish "reasonable standards relating to the qualifications of providers." 42 C.F.R. § 431.51(c)(2). This authority, however, does not suggest that states are free to ascribe *any* meaning to the statutory term "qualified"—including a meaning " 'entirely strange to those familiar with its ordinary usage.' " *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 596 (1973) (quoting *De Sylva v. Ballentine*, 351 U.S. 570, 581 (1956)). As the limiting term "reasonable" in the regulation suggests, a state's authority to determine provider qualifications must be keyed to the "permissible variations in the ordinary concept" of what it means to be "qualified" in this particular context. *De Sylva*, 351 U.S. at 581.

Read in context, the term "qualified" as used in § 1396a(a)(23) unambiguously relates to a provider's

fitness to perform the medical services the patient re-
quires. The statute provides that Medicaid beneficiaries
"may obtain [medical] assistance from any institution,
agency . . . or person[] *qualified to perform the service or
services required*." To be "qualified" in the relevant sense
is to be capable of performing the needed medical services
in a professionally competent, safe, legal, and ethical
manner. Planned Parenthood's clinics are "qualified" in
the sense meant by § 1396a(a)(23).

Indiana argues that the term is more elastic and
includes the authority to establish provider-eligibility
criteria based on any legitimate state interest. That inter-
pretation of § 1396a(a)(23) would lead to strange results.
If the states are free to set any qualifications they
want—no matter how unrelated to the provider's fitness
to treat Medicaid patients—then the free-choice-of-pro-
vider requirement could be easily undermined by
simply labeling any exclusionary rule as a "qualification."
This would open a significant loophole for restricting
patient choice, contradicting the broad access to medical
care that § 1396a(a)(23) is meant to preserve.

Indiana attempts to articulate a limiting principle, but
its effort is unpersuasive. It suggests that "a [s]tate may
not use a qualification to target patient choice as
such—for example by eliminating *all* choice in the
market—but it may *reduce* patient choice incident to a
qualification targeting some legitimate government
objective, such as the desire not to subsidize abortion
even indirectly." This argument inverts what the statute
says. Section 1396a(a)(23) does not simply bar the states

from ending *all* choice of providers, it guarantees to every Medicaid beneficiary the right to choose *any* qualified provider.

Looking for support elsewhere in the Medicaid Act, Indiana focuses on § 1396a(p)(1), which elaborates on the states' authority to exclude Medicaid providers:

> In addition to any other authority, a State may exclude any individual or entity for purposes of participating under the State plan under this subchapter for any reason for which the Secretary could exclude the individual or entity from participation in a program under subchapter XVIII of this chapter under section 1320a-7, 1320a-7a, or 1395cc(b)(2) of this title.

42 U.S.C. § 1396a(p)(1). The cross-referenced sections of the Medicaid Act—§§ 1320a-7, 1320a-7a, and 1395cc(b)(2)— pertain to mandatory or permissive exclusions of providers for various forms of malfeasance such as fraud, drug crimes, and failure to disclose necessary information to regulators. Indiana emphasizes the phrase "[i]n addition to any other authority" and suggests that this language implies a plenary power reserved to the states to exclude Medicaid providers as they see fit. This reads the phrase for more than it's worth. "[I]n addition to any other authority" signals only that what follows is a nonexclusive list of specific grounds upon which states may bar providers from participating in Medicaid. It does not imply that the states have an unlimited authority to exclude providers for any reason whatsoever.

To bolster its implied-authority argument, Indiana relies on a Senate Finance Committee Report explaining that § 1396a(p)(1) "is not intended to preclude a State from establishing, under State law, *any other bases for excluding individuals or entities* from its Medicaid program." S. REP. NO. 100-109, at 20 (1987) (emphasis added), *reprinted in* 1987 U.S.C.C.A.N. 682, 700. The Senate Report is not useful here; it suggests only that § 1396a(p)(1) does not have preemptive effect. The Senate Report does not—indeed, it cannot—alter the plain meaning of "qualified" as that term is used in § 1396a(a)(23).

Indiana also points to 42 U.S.C. § 1320a-7(b)(14), which allows states to exclude providers who are in default on their student-loan payments, and from this provision makes another argument by implication: If the states may refuse to subsidize student-loan delinquents with Medicaid dollars, then they must have the authority to "avoid indirect financing" of any "non-Medicaid" conduct. But like § 1396a(p)(1), this statute merely stipulates a *particular ground* for excluding a Medicaid provider; it does not imply that the states may establish *any* rule of exclusion and declare it a provider "qualification" for purposes of § 1396a(a)(23). That would make the free-choice-of-provider requirement a nullity.

Finally, the cases Indiana cites do not support its position. In *First Medical Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46 (1st Cir. 2007), for instance, the First Circuit simply recognized the point we have just made—that states may exclude providers from participating in Medicaid for reasons not listed in § 1396a(p)(1). *Vega-*

*Ramos*, moreover, involved a conflict-of-interest rule applicable only in Puerto Rico; the First Circuit had no reason to consider the effect of the free-choice-of-provider requirement, which does not apply to Puerto Rico's Medicaid program. *See* 42 U.S.C. § 1396a(a)(23)(B). The court's opinion thus cannot be understood to suggest that states may override the free-choice-of-provider requirement by creating "qualifications" wholly unrelated to the competent delivery of medical services.

Nor does *Guzman v. Shewry*, 552 F.3d 941 (9th Cir. 2009), help Indiana's case. There, a provider was suspended from California's Medicaid program based on a pending criminal investigation. He claimed that federal law occupies the entire field of regulation pertaining to Medicaid and therefore preempted the state's disciplinary measure. The Ninth Circuit rejected this argument, relying in part on 42 U.S.C. § 1320a-7(b)(5), which provides that the states may suspend or exclude providers from participating in Medicaid "for reasons bearing on the individual's or entity's professional competence, professional performance, or financial integrity." The court remarked that this provision presupposes state regulatory authority over provider qualifications. *Guzman*, 552 F.3d at 949.

No one disputes that the states retain considerable authority to establish licensing standards and other related practice qualifications for providers—this residual power is inherent in the cooperative-federalism model of the Medicaid program and expressly recognized in the Medicaid regulations. *See* 42 C.F.R. § 431.51(c)(2)

(providing that states may establish "reasonable standards relating to the qualifications of providers"). This case raises a question about the *limits* of that authority. *Guzman*, which involved state action falling within the core of the state's residual authority, does not support Indiana's argument.

Before concluding our discussion of the Medicaid Act claim, a few words about agency deference, which the district court applied and the parties briefed on appeal. As an additional reason to affirm the district court's decision, Planned Parenthood argues, and the United States agrees, that we should defer to the CMS Administrator's interpretation of § 1396a(a)(23) under *Chevron*. *See Chevron, U. S. A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). But *Chevron* deference is triggered only when a statute is ambiguous. *Id.* at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). As we have explained, the term "qualified" as used in § 1396a(a)(23) unambiguously refers to the provider's fitness to render the medical services required. *See generally Carcieri v. Salazar*, 555 U.S. 379, 391 (2009) (noting that statutory text susceptible to alternative meanings is not ambiguous when its meaning is clear in light of the statutory context). In the absence of ambiguity, *Chevron* deference does not come into play.

Because Indiana's defunding law excludes a class of providers from Medicaid for reasons unrelated to provider qualifications, we agree with the district court that Planned Parenthood is likely to succeed on its

claim that Indiana's defunding law violates § 1396a(a)(23). This brings us to the district court's evaluation of the balance of harms and the effect of preliminary injunctive relief on the public interest.

### 3.  Balance of Harms and the Public Interest

The court below held that the loss of Medicaid funding would cause Planned Parenthood immediate irreparable harm. Indiana does not seriously challenge this conclusion. Planned Parenthood would have to lay off dozens of workers, close multiple clinics, and stop serving a significant number of its patients. *Planned Parenthood of Ind.*, 794 F. Supp. 2d at 912. Absent a preliminary injunction, its Medicaid patients would lose their provider of choice for the duration of the litigation. *Id.* at 912-13. These harms are entitled to significant weight given Planned Parenthood's strong likelihood of success on the merits of its Medicaid Act claim. In addition, the district court noted that "[t]he federal government has threatened partial or total withholding of federal Medicaid dollars to the State of Indiana, which could total well over $5 billion dollars annually and affect nearly 1 million Hoosiers." *Id.* at 913. The judge saw "a high-stakes political impasse" looming, with the well-being of Indiana's Medicaid patients hanging in the balance: "[I]f dogma trumps pragmatism and neither side budges, Indiana's most vulnerable citizens could end up paying the price as the collateral damage of a partisan battle." *Id.* This helped tip the scales in favor of a preliminary injunction.

Without endorsing the political commentary, we see no reason to disturb the district court's assessment of the balance of harms and the public interest. Indiana maintains that any harm to Planned Parenthood's Medicaid patients is superficial because they have many other qualified Medicaid providers to choose from in every part of the state. This argument misses the mark. That a range of qualified providers remains available is beside the point. Section 1396a(a)(23) gives Medicaid patients the right to receive medical assistance from the provider of their choice without state interference, save on matters of provider qualifications.

Indiana also argues that the district court's preliminary injunction "completely undermines" the public's interest in the established administrative process. We cannot see how. Indiana's appeal of the CMS Administrator's decision has proceeded in the ordinary course. It is true that the federal government's position as an amicus curiae in this litigation makes it unlikely that the HHS Secretary will overrule the CMS Administrator's decision and approve Indiana's request to amend its Medicaid plan. But that has no real effect on the balance of harms. And if the Secretary approves the plan amendment, Indiana may ask for relief from the preliminary injunction.

In the end, our review of this aspect of the district court's decision is deferential. The judge appropriately weighed the relative harm to the parties and the public interest and reasonably concluded that it warranted

preliminary injunctive relief on the Medicaid Act claim. That decision was not an abuse of discretion.

### B. Block-Grant Preemption Claim

The district court also enjoined Indiana from enforcing Act 1210 to halt the payment of money Planned Parenthood receives from the State under a federal block-grant program for the diagnosis and monitoring of sexually transmitted diseases. The statutory authority for the program is as follows:

> **§ 247c. Sexually transmitted diseases; prevention and control projects and programs**
>
> . . . .
>
> (c) Project grants to States
>
> The Secretary is also authorized to make project grants to States and, in consultation with the State health authority, to political subdivisions of States, for—
>
> (1) sexually transmitted diseases surveillance activities, including the reporting, screening, and followup of diagnostic tests for, and diagnosed cases of, sexually transmitted diseases . . . .

42 U.S.C. § 247c.

The Disease Intervention Services agency ("DIS") administers the grants at the federal level. In 2011 Indiana awarded Planned Parenthood two grants totaling $150,000 from federal funds the State received from DIS under § 247c(c). Planned Parenthood has re-

ceived grants from this program continuously since 1996 and alleges that but for Act 1210, it would receive renewals on an ongoing basis. The defunding law canceled Planned Parenthood's 2011 contracts and makes the organization ineligible for future grants or renewals.[10]

The district court accepted Planned Parenthood's argument that § 247c(c) preempts the defunding law and on this basis enjoined Indiana from cutting off the organization's funding under this program. There are several problems with the court's analysis. First, § 247c(c) does not create private rights actionable under § 1983. No one argued to the contrary, but the judge held that Planned Parenthood's preemption claim may proceed anyway, as a direct claim under the Supremacy Clause. That was very likely an error. Even if it was not, Planned Parenthood cannot succeed on the merits of this claim. Section 247c(c) places no conditions on recipient states other than the basic requirement that the block-granted money be used for the stated purposes. Finally, the unconstitutional-conditions doctrine does not supply an alternative basis to affirm the injunction on the block-grant claim.

---

[10] The complaint also mentions other federal block-grant programs under which Planned Parenthood receives state-administered federal funds, but the injunction proceeding was limited to § 247c(c).

### 1. Does the Supremacy Clause Supply a Preemption Right of Action?

By its terms, § 247c(c) merely authorizes the HHS Secretary to make grants to the states for surveillance activities relating to sexually transmitted diseases. The statute confers no individual rights and therefore the remedy of § 1983 is unavailable. Planned Parenthood acknowledges as much, but persuaded the district court that the Supremacy Clause supplies a preemption right of action of its own force. We have our doubts.

It is well-established that the Supremacy Clause is "not a source of any federal rights." *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 613 (1979); *see also Ill. Ass'n of Mortg. Brokers v. Office of Banks & Real Estate*, 308 F.3d 762, 765 (7th Cir. 2002) (recognizing that the Supremacy Clause "does not of its own force create rights"). The Supremacy Clause "'secure[s] federal rights by according them priority whenever they come in conflict with state law.'" *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989) (alteration in original) (quoting *Chapman*, 441 U.S. at 613) (internal quotation marks omitted).

Just this past Term, the Supreme Court was set to decide a case raising the question whether Medicaid providers and recipients could bring a claim that the Medicaid Act preempts state statutes reducing Medicaid payments to providers. *See Douglas*, 132 S. Ct. at 1207. In *Douglas*, as here, the providers and recipients had no statutory right of action under the Medicaid Act, but the Ninth Circuit said they could bring the suit directly under the Supremacy Clause. *Id.* at 1209. The Supreme

Court granted certiorari to decide whether the court of appeals was correct. *Id.* While the case was pending, however, CMS approved California's statutory scheme. *Id.* The Court held that this development did not moot the case, *id.* at 1209-10, but remanded to the Ninth Circuit to permit that court to address the impact of this new development "in the first instance," *id.* at 1211.

Chief Justice Roberts dissented, joined by Justices Scalia, Thomas, and Alito. In their view, the Court should have kept the case and decided the legal question presented: whether the Supremacy Clause provides a cause of action to enforce the requirements of a Spending Clause statute when Congress has not provided a right of action in the statute itself. *Id.* at 1212 (Roberts, C.J., dissenting). That is the precise question here, and although the Court ultimately left it for another day, we can take some cues from the Chief Justice's analysis.

The Chief Justice began by reiterating the principle that the Supremacy Clause does not create federal rights, but instead "simply ensures that the rule established by Congress controls." *Id.* at 1213. In other words, the role of the Supremacy Clause is simply to "ensure that, in a conflict with state law, whatever Congress says goes." *Id.* at 1212. So "if Congress does not intend for a statute to supply a cause of action for its enforcement, it makes no sense to claim that the Supremacy Clause itself must provide one." *Id.* In this situation, implying a direct right of action under the Supremacy Clause "would effect a complete end-run around [the Court's] implied right of action and 42 U.S.C. § 1983 jurisprudence." *Id.* at 1213. In

No. 11-2464                                    37

the view of the dissenting justices in *Douglas*, a proper understanding of the Supremacy Clause compelled the conclusion that "[w]hen Congress did not intend to provide a private right of action to enforce a statute enacted under the Spending Clause, the Supremacy Clause does not supply one of its own force." *Id.* at 1215.

Other than the Ninth Circuit's decision in *Douglas,* few appellate opinions have recognized a freestanding right to bring a preemption action under the Supremacy Clause, though we acknowledge that there are some. *See, e.g.*, *Wilderness Soc'y v. Kane County, Utah*, 581 F.3d 1198, 1216 (10th Cir. 2009), *vacated on other grounds*, 632 F.3d 1162 (10th Cir. 2011) (en banc); *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 331-35 (5th Cir. 2005). This approach is controversial (as the grant of certiorari in *Douglas* implies), and we think highly doubtful, for the reasons articulated by the *Douglas* dissenters.

This is not, moreover, a circumstance covered by the doctrine of *Ex parte Young*, 209 U.S. 123 (1908). The preemption claim here, as in *Douglas,* does not involve the "pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law." *Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1642 (2011) (Kennedy, J., concurring); *see also Douglas*, 132 S. Ct. at 1213 (Roberts, C. J., dissenting). In other words, Indiana is not threatening Planned Parenthood with an enforcement action or otherwise trying to regulate its behavior through an action at law; the State has simply turned off the funding spigot.

If Planned Parenthood's preemption claim is to proceed, we would have to agree with its position that the Supremacy Clause supplies a right of action of its own force. We are not inclined to agree, but we do not need to commit ourselves here. Planned Parenthood's preemption claim cannot succeed on the merits. Because our jurisdiction is not at issue, we can assume without deciding the right-of-action question and proceed directly to the merits. *See Nw. Airlines, Inc. v. County of Kent, Mich.*, 510 U.S. 355, 365 (1994) ("The question whether a federal statute creates a claim for relief is not jurisdictional."); *see also Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 457-58 (7th Cir. 2007) (assuming a right of action exists and deciding the case on the merits because "[a] private right of action is not a component of subject-matter jurisdiction"); *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 911 (7th Cir. 2003) (same).

## 2.   *Likelihood of Success on the § 247c(c) Preemption Claim*

By its terms, § 247c(c) does no more than authorize the HHS Secretary to make federal block grants to the states to help pay for programs that diagnose and monitor sexually transmitted diseases. The only restriction on the states is that the federal money be used for the stated purposes. Beyond that, § 247c(c) attaches no strings to the block-granted money at all. Nor has Planned Parenthood identified any related federal statute or regulation that expressly limits how a recipient state may disburse

these funds.[11] Indiana's defunding law cannot possibly conflict with a block-grant statute as unrestricted as this one.

Nonetheless, the district court concluded that Indiana is not free to decide how to distribute its § 247c(c) funds. Without discussing the statutory text at all, the court held that § 247c(c) "does not suggest that states are permitted to determine eligibility criteria for the DIS grants." *Planned Parenthood of Ind.*, 794 F. Supp. 2d at 912. This inverts established preemption analysis, which begins with a presumption *against* preemption and focuses first on the text of the statute. *Wyeth v. Levine*, 555 U.S. 555, 565 & n.3 (2009). Unless Congress has "indicate[d] pre-emptive intent through a statute's express language or through its structure and purpose," the state law is

---

[11] Planned Parenthood makes passing reference to 42 C.F.R. § 51b.106(e), but that regulation simply provides that the Secretary of HHS may impose conditions on the state's use of § 247c(c) block-granted funds at the time the grant is made, "including conditions governing the use of information or consent forms, when, in the [federal government's] judgment, they are necessary to advance the approved program, the interest of the public health, or the conservation of grant funds." Without explanation, the district court also relied on § 51b.106(e). *See Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 794 F. Supp. 2d 892, 912 (S.D. Ind. 2011). The regulation has no relevance here. It simply makes explicit what is already implicit in the Secretary's authority to make block grants: that she may attach specific conditions to a state's § 247c(c) block-grant funding at the time the grant is made.

presumed to be valid. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).

Because § 247c(c) contains no express preemption language, only implied preemption is even conceivably at issue. Implied preemption comes in two types: (1) field preemption, which arises when the federal regulatory scheme is so pervasive or the federal interest so dominant that it may be inferred that Congress intended to occupy the entire legislative field; and (2) conflict preemption, which arises when state law conflicts with federal law to the extent that "compliance with both federal and state regulations is a physical impossibility," or the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (internal quotation marks and citations omitted). Field preemption and the "impossibility" form of conflict preemption are not implicated here. That leaves only obstacle preemption.

We note for starters that the district court's view that Indiana may not impose eligibility conditions on DIS subgrants conflicts with the basic structure and purpose of block-grant funding. As a general matter, federal block grants devolve control to the states over the disbursement of federal funds. Of course, Congress may restrict a recipient state's disbursement of block-granted money in a variety of ways, *see King v. Smith*, 392 U.S. 309, 333 n.34 (1968), as when the federal statute or implementing regulations expressly provide eligibility criteria for subgrants from states, *see N.Y. State Dep't of*

*Soc. Servs. v. Dublino*, 413 U.S. 405, 421-22 (1973). But if the federal law allows room for state-imposed eligibility conditions, then the recipient state is free to establish its own eligibility criteria unless the party asserting preemption meets its burden of showing that the state rules frustrate the federal objective. *Id.* (distinguishing between grants where federal law "expressly provided [who] would be eligible" and those where federal law allowed for "complementary" state conditions).

The district court stood this principle on its head. The question is not whether § 247c(c) expressly *allows* a recipient state to impose its own subgrant conditions, as the district court seemed to think. Instead, the pertinent question is whether § 247c(c) *prohibits* state-imposed eligibility conditions, either expressly or by necessary implication. As we have noted, congressional and regulatory silence usually *defeats* a claim of preemption, not the other way around. *See Wyeth*, 555 U.S. at 602-03 (Thomas, J., concurring in the judgment).

Nothing in § 247c(c) or its implementing regulations restricts Indiana's authority over subgrants. Absent a conflict between state and federal law in the first place, state law cannot possibly stand as an obstacle to the accomplishment of congressional objectives. "[S]tate law is displaced only 'to the extent that it actually conflicts with federal law.'" *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476 (1996) (per curiam) (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983)). Because Indiana's § 247c(c) funding is unrestricted, there is no conflict between state and federal law.

The district court relied on a series of cases regarding block-grant family-planning funding under Title X. *See, e.g., Sanchez*, 403 F.3d at 336-37; *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 663-64 (D.C. Cir. 1983); *Valley Family Planning v. North Dakota*, 661 F.2d 99, 100-02 (8th Cir. 1981). Indiana pointed out that Title X's implementing regulations contain an explicit open-eligibility requirement—"[a]ny public or nonprofit private entity in a State may apply for a grant," 42 C.F.R. § 59.3—while § 247c(c) and its regulatory scheme do not, *see* 42 C.F.R. § 51b.106. The district court ignored this critical distinction. The Title X cases have no bearing here.

Simply put, Indiana's defunding law does not conflict with § 247c(c) or its implementing regulations. Having "identified *no* significant conflict with an identifiable federal policy or interest," *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 88 (1994), Planned Parenthood cannot succeed on the merits of its preemption claim. The district court should not have enjoined the enforcement of Act 1210 with respect to Indiana's DIS block-grant funding.

### 3.  *Unconstitutional-Conditions Doctrine*

Having decided to order preliminary injunctive relief on the statutory claims, the district court had no need to address Planned Parenthood's unconstitutional-conditions claim. Our decision on the merits of the preemption claim brings this alternative theory into play. If viable and likely to succeed, Planned Parenthood's unconstitu-

No. 11-2464                                      43

tional-conditions claim may serve as an independent basis to affirm the judge's order prohibiting the termination of its DIS funding. The issue was preserved in the district court, the parties have briefed it on appeal, and because it raises a purely legal question, it makes sense for us to address it here. *See Bennett v. Spear*, 520 U.S. 154, 166-67 (1997) ("The asserted grounds were raised below, and have been fully briefed and argued here; we deem it an appropriate exercise of our discretion to consider them now rather than leave them for disposition on remand."); *see also Alvarez*, 679 F.3d at 590.

"The 'unconstitutional conditions' doctrine is premised on the notion that what a government cannot compel, it should not be able to coerce." *Libertarian Party of Ind. v. Packard*, 741 F.2d 981, 988 (7th Cir. 1984). Understood at its most basic level, the doctrine aims to prevent the government from achieving indirectly what the Constitution prevents it from achieving directly. Thus, "[t]he denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly." *Elrod v. Burns*, 427 U.S. 347, 361 (1976) (plurality opinion). This does not mean that the myriad public benefits dispensed at all levels of government have the status of constitutional rights; rather, the doctrine prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise of a constitutional right. As the Supreme Court explained the doctrine in *Perry v. Sindermann*,

> even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . .

408 U.S. 593, 597 (1972).

The first step in any unconstitutional-conditions claim is to identify the nature and scope of the constitutional right arguably imperiled by the denial of a public benefit. *See* Michael W. McConnell, *The Selective Funding Problem: Abortions and Religious Schools*, 104 HARV. L. REV. 989, 992 (1991) (observing that a claim that a selective-funding decision is an unconstitutional condition requires "careful consideration of the nature of the constitutional right implicated by the funding decision, including the nature of the countervailing interests of the government"); Cass R. Sunstein, *Is There an Unconstitutional Conditions Doctrine?*, 26 SAN DIEGO L. REV. 337, 338 (1989) ("Whether a condition is permissible is a function of the particular constitutional provision at issue . . . ."). Here, Planned Parenthood's unconstitutional-conditions claim necessarily derives from a woman's constitutional right to obtain an abortion. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992) ("Constitutional protection of *the woman's* decision to terminate her pregnancy derives from the Due Process Clause of the Fourteenth Amendment." (emphasis added)). Under existing precedent any protection for Planned Parenthood as an

abortion provider is "derivative of the woman's position." *Id.* at 884 (plurality opinion).

Two aspects of the Supreme Court's abortion jurisprudence are important here. First, the Court has explained that the constitutional right to obtain an abortion is a right against coercive governmental burdens; the government may not "prohibit any woman from making the ultimate decision to terminate her pregnancy" before fetal viability or impose an "undue burden on a woman's ability to make this decision." *Id.* at 874, 879; *see also Gonzales v. Carhart*, 550 U.S. 124, 146 (2007). An "undue burden" exists if the challenged law has the "purpose or effect" of placing "a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey*, 505 U.S. at 878 (plurality opinion); *see also Gonzales*, 550 U.S. at 146.

Accordingly, the Court has conceptualized the right as "a constitutionally protected interest 'in making certain kinds of important decisions' free from governmental compulsion." *Maher v. Roe*, 432 U.S. 464, 473 (1977) (quoting *Whalen v. Roe*, 429 U.S. 589, 599-600 & nn.24 & 26 (1977)).

This brings up the second important point. The Court has explicitly rejected a neutrality-based view of abortion rights. Thus, the Court has held that although the abortion right recognized in *Roe v. Wade*[12] "protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her preg-

---

[12] 410 U.S. 113 (1973).

46                                        No. 11-2464

nancy[,] [i]t implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." *Id.* at 473-74. In *Maher* the Court upheld Connecticut's ban on public funding for nontherapeutic abortions because it "places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion." *Id.* at 474. The Court reaffirmed *Maher* in *Harris v. McRae*, 448 U.S. 297, 314-17 (1980), upholding the Hyde Amendment. And in *Webster v. Reproductive Health Services*, 492 U.S. 490, 508-11 (1989), the Court upheld Missouri's statutory ban on the use of public employees and facilities to perform or assist in the performance of an abortion.

Finally, in *Rust v. Sullivan*, 500 U.S. 173 (1991), the Court rejected a challenge to federal regulations prohibiting recipients of Title X family-planning grants from advocating abortion as a method of family planning or referring patients for abortion. Under the regulations, grant recipients with abortion-related practices could continue to receive Title X money only if they segregated their abortion-related activities in a separate affiliate. *Id.* at 179-81. *Rust* held that the regulations did not place an unconstitutional condition on Title X grant recipients. *Id.* at 203. This was so whether the claim was premised on the speech rights of the providers, *id.* at 196-99, or the abortion rights of their patients, *id.* at 201-03. As relevant here, the Court reaffirmed the holdings of *Webster*, *Harris*, and *Maher* that "[t]he Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected and

may validly choose to fund childbirth over abortion." *Id.* at 201. Because the Title X regulations did not place an undue burden on a woman's right to obtain an abortion or otherwise impose an unconstitutional condition on grant recipients, the Court upheld the regulatory scheme. *Id.* at 203.

As these cases make clear, the government need not be neutral between abortion providers and other medical providers, and this principle is particularly well-established in the context of governmental decisions regarding the use of public funds. As long as the difference in treatment does not unduly burden a woman's right to obtain an abortion, the government is free to treat abortion providers differently.

Applying these principles here, the unconstitutional-conditions claim is not likely to succeed. Planned Parenthood does not argue that the loss of its block-grant funding imposes an undue burden—directly or indirectly—on a woman's right to obtain an abortion. If, as the foregoing cases hold, the government's refusal to subsidize abortion does not unduly burden a woman's right to obtain an abortion, then Indiana's ban on public funding of abortion providers—even for unrelated services—cannot *indirectly* burden a woman's right to obtain an abortion.[13] *See Rumsfeld v. Forum for Academic &*

---

[13] The unconstitutional-conditions doctrine would be implicated if a state adopted a policy of withholding unrelated public benefits from a woman who had an abortion. *See Harris v. McRae*, 448 U.S. 297, 317 n.19 (1980) ("A substantial
(continued...)

*Institutional Rights, Inc.*, 547 U.S. 47, 59-60 (2006) ("It is clear that a funding condition cannot be unconstitutional if it could be constitutionally imposed directly."). Planned Parenthood offers nothing else in support of its unconstitutional-conditions claim.[14] Accordingly, this theory does not provide an alternative basis to affirm the district court's order prohibiting Indiana from terminating Planned Parenthood's DIS funding.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's order granting preliminary injunctive relief on Planned Parenthood's Medicaid Act claim. We REVERSE the order as it relates to the State's § 247c(c) block-grant funding and REMAND the case with instructions to modify the injunction accordingly.

---

[13] (...continued)
constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion.").

[14] The parties debate the feasibility of segregating Planned Parenthood's abortion-related services in a separate affiliate organization, as in the Title X regulatory scheme at issue in *Rust*. *See Rust v. Sullivan*, 500 U.S. 173, 179-81 (1991). That issue is not directly relevant here. The defunding law does not, on its face, provide for this option, and Planned Parenthood does not now organize its affairs in this way.

No. 11-2464                                    49

CUDAHY, concurring in part and dissenting in part. I join Part IIA of the majority opinion in full. I also join Part IIB1 and IIB2 but do not join Part IIB3 or the reversal of the judgment requiring modification of the preliminary injunction insofar as it prohibits state restrictions on § 247c(c) block-grant funding. I believe the issue of unconstitutional conditions should be remanded to the district court for development of the record with respect to any possible imposition of a burden on access to abortions. In arguing the matter below, Planned Parenthood was required to defend both its Medicaid and block-grant funding. Unsurprisingly, Planned Parenthood focused on Medicaid and aimed its brief primarily at the appropriate interpretation of § 1396a(a)(23). The § 247c(c) block-grant funding received comparatively little attention from both parties as well as numerous amici in this case. I believe it is premature for this court to address this issue on the present record. Plaintiffs may not have fully addressed this issue below, but the fundamental constitutional nature of this issue should preclude its disposition on less than an adequate record.